Stanley Gartenstein, J.
This proceeding pursuant to article 4 of the Family Court Act for the support of the petitioning former wife brings into focus the interaction between the matrimonial laws of this State and the Jewish religious law of divorce when made relevant by contractual act between parties to an agreement. With the sociological reality of a tremendously increased divorce rate upon us, a phenomenon which cuts across all levels of society, Orthodox Jews find themselves in matrimonial litigation more often and courts are called upon to weigh the import of ecclesiastical laws which are often made crucial by contractual act of the parties. Understandably there is much confusion about these laws and courts often find themselves at a loss when called upon to delve into religious law to which there is no definitive guide in the usual legal sources. A short synopsis, therefore, would appear to be in order.
*778 Petitioner and respondent were married in 1929 and divorced by decree .of an Alabama court entered on April 15, 1961 which incorporated by reference but did not merge, a separation agreement executed by the parties on March 10, 1961. By the terms of the agreement, respondent was to pay the sum of $30 per week as maintenance for petitioner aside from amounts for the children, now emancipated. Proceedings for enforcement of this decree were brought in this court in 1972 and withdrawn when an agreement in writing was reached between the parties dated and acknowledged on October 4, 1972. In this document, .the wife represented that she was self supporting and agreed to accept the lump sum payment of $4,740 in full settlement of any past, present or future claims against her former husband. • A specific term of the agreement inserted in ink and initialled by the parties provided that each of the parties was to co-operate in securing a Jewish divorce (hereinafter referred to as Get] see footnote 2, infra). Respondent did in fact make tender of the lump sum settlement which was refused. Petitioner also refused to appear at a Rabbinical religious court in furtherance of her agreement to co-operate in securing the Get.
Not satisfied with the settlement or with respondent’s tender of performance, petitioner commenced a second proceeding by petition dated November 13, 1972, once again seeking enforcement of the Alabama decree in accordance with its original terms, totally ignoring the agreement which was never nullified. This proceeding resulted in a consent order without prejudice providing for the continued payment of $100 per month plus arrears of $1,000, again with the understanding that petitioner co-operate in securing the Get.
Petitioner now seeks enforcement of arrears based upon this latest “ settlement ”. Respondent has paid the lump sum toward arrears and apparently nothing more. He alleges that petitioner has failed to co-operate in securing the Get, a condition precedent upon which the settlement was made contingent. At the first hearing, the wife indeed expressed her refusal to appear at the rabbinical court for the Get but expressed no reservations or opposition to the Get itself. On this basis, the court ruled that inasmuch as the wife’s presence was unnecessary at these proceedings if her assent was otherwise manifested, directed compliance with the latest settlement based upon the fact that respondent’s factual defense of failure of a condition precedent was unfounded under the very ecclesiastical law upon which he purported to rely. *779 The matter was then adjourned to enable completion of these proceedings and a progress report was directed. On the adjourned date, petitioner, evidently expressing a change of heart, now refused to manifest consent to the Get. She further attacked the agreement which compromised the first enforcement proceeding as being void because she was not represented by counsel during its execution. •
Petitioner and respondent both support themselves from Social Security payments. In addition respondent receives a nominal pension and some sporadic income. The court indeed finds petitioner to be self supporting as she represented herself to be in writing.

JEWISH ECCLESIASTICAL LAW OF DIVORCE:

Marriage, which under Anglo-Saxon jurisprudence is a continuing quasi-contractual relationship arising out of the original agreement solemnized in a manner recognized by the State, (Domestic Relations Law, § 10) is, under Talmudic law, strictly a contract given validity solely by continued contractual act of the parties, either express or implied (Kiddushin 1A)[1]. Indeed, if the Ketubah (marriage contract) leaves the actual or constructive possession of the wife at any time subsequent to the effective commencement date of the marriage contract, further cohabitation is forbidden (Ketubot 7; Even-Ha-Ezer, 66,1).
Accordingly, given the legal definition of marriage, the Get or divorce is a simple act of release nominally executed by the husband for delivery to the wife “ freeing 55 her for marriage to anyone else, having its Biblical origins in Genesis 21, verses 9-14 and Deuteronomy 22, verses 13-19[2].
*780 The notion that the Get is a judicial decree requiring appearance and participation by both parties is fallacious. While the formal drafting of the instrument requires the assistance of “those learned in the law ” (Kiddushin 60), a Get is Talmudically valid when executed by the husband without the presence of the wife and delivered by his agent (Gittin 1A).
The foregoing is not to imply that the function of the court was nil or that the Get was within the sole province of the husband. Indeed, where grounds existed, the Bet Din (religious court) was convened at the suit of the wife for injunctive relief directing the husband to execute and cause delivery of the Get freeing her. On the other hand, even where proceedings were at the instance of the husband, the staggering minutiae of technical details requiring the assistance of experts (Kiddushin 60), gave the Rabbinical courts a res upon which to seize in acquiring judicial powers.
Jewish law is framed on the theory that a dead marriage should be dissolved. While divorce by consent (the Talmud recognized no-fault divorce 2,000 years ago) is the outgrowth of this attitude, the Rabbinical authorities always took great pains to insure that the marriage was really dead and that the parties were afforded every opportunity to turn back. In this spirit, the procedural minutiae involved in the execution and delivery of the Get became the vehicle wherein the religious courts assumed their judicial function. For, with the power to lend or withhold that expertise of those ‘ ‘ learned in the law ’ ’ as required by Kiddushin 60, the execution and delivery of a Get became virtually impossible without the help of the Rabbinical court which was extended or withheld depending on the existence of specified grounds when mutual consent was not manifested. In the process of exercising this “ judicial ” function, Rabbinical courts developed the principle that no wife was to be divorced against her will unless certain grounds existed. This practice of Rabbinical law, in existence for about a thousand years from earliest Talmudic times, was codified by Rabbenu Gershon in the approximate year 1000 of the common calendar.
Obviously, the Get has the same importance today as it has had over the centuries because, in the absence thereof, any remarriage takes place without capacity to contract. Since the party entering the new liaison is already married under ecclesiastical law, cohabitation with the new spouse is adulterous. Finally, to complete this caveat, even if the first marriage is then dissolved by valid Get, Jewish religious law prohibits *781 marriage to a person with whom adultery has heen committed. This can result in a religious prohibition against marrying the very same second spouse with whom a party has in fact been living.
Divorce proceedings under Talmudic Law are maintainable at the suit of the wife on certain enumerated grounds (Kethuboth 77; Mishne Torah, Marriages, XXV; Even Ha-Ezer 154: 118, 11 Rema; M. Kethuboth VII, 10; Even Ha-Ezer 134: 1 Rema; Even Ha-Ezer 154: 3 Rema); at the suit of the husband under circumstances where the financial emoluments of the Ketubah were forfeited (Kethuboth 72; Even Ha-Ezer 115, 4,5); or by the court on its own suit against the wishes of the parties (M. Yevamot VIII, 3; Avodah Zarah 36B; M. Yevamot II, 8). In addition to the foregoing, the Rabbinical authorities constituted as courts, had the function of monitoring situations in which a Get was Biblically forbidden (e.g., prior unfounded accusation of unchastity by the husband (Deuteronomy 22 verses 13-19).[3]
Applying these principles to the matter in litigation: at the time the wife indicated her willingness to accept the Get, but her refusal to attend proceedings for that purpose, the husband’s contention of nonco-operation was without merit (Gittin 1A). However, with the wife now refusing co-operation, viz., consent, the position of the husband under ecclesiastical law is untenable. At this juncture, respondent’s claim that petitioner’s failure to co-operate has prejudiced him takes on irresistible merit. Having established this, the court is now faced with issues which may circumscribe its ability to enforce the agreement.

SEPARATION OF CHURCH AND STATE:

ENFORCEABILITY OF AGREEMENT

As a general proposition, the fact that parties to an agreement may be married or may be contemplating by agreement, the dissolution thereof, has no bearing on the basic rule of contracts that people are bound by the promises they undertake. Parties to a separation agreement may make alimony or even child support contingent on the express terms thereof (Callender v. Callender, 37 A D 2d 360). And where this agree *782 ment survives the entry of a divorce decree, it will he enforced independently even when adherence to any condition precedent therein may have the effect of cutting off support moneys (Callender v. Callender, supra, citing Hettich v. Hettich, 304 N. Y. 8; McMains v. McMains, 15 N Y 2d 283).
Constitutionally, it has been held that the separation of church and State mandated by the First Amendment carries with it the obligation of the State to refrain from any act which might interfere with religious disciplines and/or from any act which might interfere with religious tribunal (Watson v. Jones, 13 Wall [80 U. S.] 679). The courts of the realm are constitutionally enjoined from entering a dispute with religious implications where the matter has been the subject of litigation in the ecclesiastical courts (Watson v. Jones, supra). In this holding, the result was reached even when the 'subject matter of the dispute was real property, a commodity jealously reserved for the jurisdiction of the local courts.
The courts of this State have recognized the validity of an agreement to obtain a Get. In Koeppel v. Koeppel (138 N. Y. S. 2d 366) the court refused to dismiss an action for specific performance of a defendant husband’s agreement to comply with the necessary procedure to effectuate a Jewish Get. On the other hand, Margulies v. Margulies (42 A D 2d 517) reversed a commitment for contempt based upon failure of a defendant husband to comply with an order directing compliance with an agreement to participate in the Get ritual. This situation is distinguishable from the matter at bar in that this court is not called upon to enforce this religious discipline against a recalcitrant party, but, rather, is being called upon by the defaulting party to enforce other relief in her favor at a time when she refuses to perform a condition precedent thereto, which happens to be an act of religious significance. The condition precedent could well have been anything else made crucial by agreement of the parties. In this latter instance, where one party to an agreement calling for a Get declines to perform, the court will either refuse any relief to the defaulting party, or will hold any application for the same in abeyance pending performance of the ¡obligations assumed pertaining to the Get. (Pal v. Pal, N. Y. L. J., July 25, 1973, p. 13, col. 5.)

ORDER:

The intent of the parties to make continued support contingent upon the wife’s co-operation in securing the Get is *783 clearly set forth. The fact that this clause was written in by hand and initialed gives it pre-eminence over any typed portion of the agreement. (Kratzenstein v. Western Assur. Co., 116 N. Y. 54; Feldman v. Fiat Estates, 25 A D 2d 750.)
The motion by petitioner to declare the agreement void is denied. The vigor of her participation in its negotiation and the number of initialed amendments show a document signed only after much arm’s length give-and-take. Petitioner was not defrauded; was not under undue influence; was certainly aware of the nature and import of the document. Indeed, its execution conforms, in every respect, to the original separation agreement upon which she relies. Its terms are clear and there are no ambiguities, in which event, it is the court’s function to enforce it rather than attempt a rewriting thereof based upon some nebulous notion of a better bargain one party thereto feels she might have extracted. (Churchill Evangelistic Assn. v. Columbia Broadcasting System, 236 App. Div. 624; Textile Capital Bldg. Corp. v. Wendel Foundation, 253 App. Div. 332, affd. 279 N. Y. 769; Friedman v. Handelman, 300 N. Y. 188.)
The consent order of February 26, 1973, without prejudice, and conditioned upon petitioner’s co-operation in securing the Get, is vacated based upon failure of the one condition made crucial by the parties upon which it was based. Proceedings are therefore rolled back to the next preceding event of significance which is the agreement of October 4,1972, executed, by its own terms as an amendment to the original separation agreement in accordance with the formalities delineated therein. The court holds the agreement valid and enforceable; it is the law of the case.
Respondent shall, within 10 days from the date of this order, consult a Rabbi of his choice for the purpose of having notice sent to petitioner either to appear or to accept a Get. If the Get is completed within two weeks after notice by the Rabbi, the other terms of the agreement shall be honored and respondent shall pay petitioner the sum of $3,740 representing the difference between the amount in the agreement and the $1,000 heretofore paid. Payment shall be made within 10 days after completion thereof. Failing same, the court, which has before it a petition to enforce á foreign decree and faced with a petitioner who, by her own representation in writing, is self supporting and whose income from Social Security derives from the same source as does respondent’s, exercises that discretion vested in it by subdivision (c) of section 466 of the Family Court Act and declines to *784 entertain this petition, in which event, this proceeding is dismissed on the merits. The fact that this court unquestionably has jurisdiction does not mean that it is bound to exercise it (Matter of Warden v. Warden, 68 Misc 2d 1080). (See, also, on the question of support for financially independent former wife, Kover v. Kover, 29 N Y 2d 408.)

. In his commentary of the Bible, the late Chief Rabbi Hertz of Great Britain apparently takes issue with this point of view (see, The Hertz Chumash, Soncino, London, 1971, 2d ed., Additional notes on Deuteronomy, section E). However, it is the Rabbi’s intention to underscore that the bare expressed terms of the contract do not begin to scratch the surface; that the obligations thus assumed are far more extensive. If one considers these duties as contractual terms outside the four walls of the instrument, imposed by law as part of the contract, the two characterizations are not contradictory.

. The very name of the marital release, Get, is derived from the statutory formula connected with its execution. Hebrew numbers, being expressed with the same letters which form words, every word has a numerical value. The word Get derives from a combination of letter gimel having numerical value of 3 plus tet, value 9; total 12 corresponding to statutory formula of 12-line instrument.
The availability of divorce by consent does not imply Biblical approval thereof. Indeed, to underscore how repugnant the tragedy of divorce is, nowhere in the original Hebrew text of the Bible does the letter tet follow the letter gimel.

. The characterization by both the majority and minority in Margulies v. Margulies (infra) that the Get can only be obtained on consent refers only to so-called “ no-fault ” decrees without reference to these grounds which when existent, require no consent and which can give rise to a Get against the will of one or even both parties.