180 N.J. Super. 260 (1981)
434 A.2d 665
BRENDA MINKIN, PLAINTIFF,
v.
BARRY MINKIN, DEFENDANT.
Superior Court of New Jersey, Chancery Division Bergen County.
Decided July 22, 1981.
*261 Lucianna, Bierman & Stillman, for plaintiff (Steven Stillman of counsel).
Ferro, Lamb & Kern, for defendant (Ralph Ferro of counsel).
MINUSKIN, J.S.C.
Plaintiff wife moved post judgment for an order requiring the defendant to obtain and pay for the costs of a Jewish ecclesiastical divorce known as a "get."[1]
*262 The significance of her motion is that only a husband may secure the get and without it the wife cannot remarry under Jewish law.
The issues are:
(1) Whether the parties have entered into a contract enforceable by this court, and
(2) Whether the relief sought by plaintiff would unconstitutionally infringe upon defendant's First Amendment right of exercise of religious freedom.
The parties were married in a Jewish ceremony where they entered into a contract, called a "ketuba," in which they agreed to conform to the provisions of the laws of Moses and Israel.[2] These laws require the husband to give his wife a get when he alleges an act of adultery on his wife's part. In the instant case the husband counterclaimed for divorce on the ground of adultery, giving rise to the wife's claim to require her husband to secure a get. The husband has refused and opposes any order to compel him to do so, claiming that such an order would violate the Establishment of Religion Clause of the First Amendment. The wife asserts that without the get she would be effectively restrained from remarrying in a manner consistent with her religious beliefs.
To compel the husband to secure a get would be to enforce the agreement of the marriage contract (ketuba). A court of equity will enforce a contract between husband and wife if it is not unconscionable to do so and if the performance to be compelled is not contrary to public policy. See Garlinger v. Garlinger, 129 N.J. Super. 37 (Ch. Div. 1974); Schlemm v. *263 Schlemm, 31 N.J. 557 (1960); Equitable Life Assur. Soc. of U.S. v. Huster, 75 N.J. Super. 492 (App.Div. 1962).
What constitutes an agreement against public policy was defined in Garlinger, supra, where the court said,
An agreement is against public policy if it is injurious to the interest of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with public morals. 17 Am.Jur.2d, Contracts, § 179 at 541. [129 N.J. Super. at 40].
In the instant case the ketuba contract requires the participants to comply with certain reciprocal obligations pertaining to the marriage. For example, the wife is to perform the role of homemaker and to supply a dowry; the husband is to support and care for the wife. The ketuba is devoid of any requirement that could be construed to be against public policy. No interest of society is affected or impaired by its provisions, nor does it conflict with public morals. On the contrary, its purpose is obviously to promote a successful marital relationship and its enforcement, therefore, actually advances public policy. The contract simply calls for defendant, in securing a get, to do that which he agreed to do. Without compliance plaintiff cannot remarry in accordance with her religious beliefs. For these reasons the contract should be specifically enforced.
The question of whether an order of this court for specific performance of the ketuba constitutes violation of defendant's First Amendment rights remains to be determined. Authority to permit the issuance of such an order appears in Koeppel v. Koeppel, 138 N.Y.S.2d 366 (Sup.Ct. 1954), and Rubin v. Rubin, 75 Misc.2d 776, 348 N.Y.S.2d 61 (Family Ct. 1973). In Koeppel, where the facts parallel the instant case, the court said:
Defendant has also contended that a decree of specific performance would interfere with his freedom of religion under the Constitution. Complying with his agreement would not compel the defendant to practice any religion, not even the Jewish faith to which he still admits adherence (paragraph Second of the complaint not denied in the answer). His appearance before the Rabbinate to answer questions and give evidence needed by them to make a decision is not a profession of faith. Specific performance herein would merely require the defendant to do what he voluntarily agreed to do. [at 373]
*264 The Koeppel and Rubin opinions are within the standards promulgated by the U.S. Supreme Court in its landmark holding of Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 772-773, 93 S.Ct. 2955, 2965-2966, 37 L.Ed.2d 948, 962-963 (1973). See, also, Marsa v. Wernik, 86 N.J. 232, 246 (1980). The Nyquist court set forth a three-prong test for determining whether an act violates the Establishment Clause of the First Amendment.
... [T]o pass muster under the Establishment Clause the law[3] in question, first, must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and, third, must avoid excessive entanglement with religion. [Nyquist, supra 413 U.S. at 773, 93 S.Ct. at 2965.]
To determine whether enforcing the marriage contract would violate the three-prong test, and because "this issue is one of the most sensitive areas in the law," the court on its own motion requested the testimony of several distinguished rabbis[4] well *265 versed in Jewish law, and one of whom (Rabbi Richard Kurtz) is also a practicing attorney specializing in matrimonial law.
Rabbi Macy Gordon defined the get as a written document of severance, authorized by the husband and delivered to his wife, which states that all marital bonds between them have been severed. He stated that a Jewish couple upon marriage enters into a ketuba, which is essentially a civil contract delineating the obligations of the parties during the marriage. The marriage is severable only by the death of one of the parties or by the acquisition of a get. Failure of the husband to secure the get places the wife in the position of an "aguna" so that she is precluded from remarrying. He said that the get does not involve a religious ceremony or require a rabbi's presence, and although the husband is required to take the initiative, he does not have to be a believer, state any doctrine or creed, or even acknowledge his Jewishness. Because of this, he concluded that the acquisition of a get is not a religious act, but a severance of a contractual relationship between two parties.
Rabbi Judah Washer agreed that a get is a civil document for the same reasons, adding that the document contains no reference to God's name. In addition, in his opinion, a court order requiring the husband to secure the get would not be an interference with religion since the get does not affect the religious feelings of people, but is only concerned with the right of the wife to remarry.
Rabbi Menahem Meier testified that Jewish law cannot be equated with religious law, but instead is comprised of two components  one regulating a man's relationship with God and *266 the other regulating the relationship between man and man. The get, which has no reference to God but which does affect the relationship between two parties, falls into the latter category and is, therefore, civil and not religious in nature.
Rabbi Richard Kurtz concurred with Rabbi Meier's opinion that Jewish law is divided into two components and that the get is clearly civil. He described the get as a general release document where the husband releases the wife and frees her to remarry in compliance with the ketuba contract.
Rabbi Dresner, a reform rabbi, was called by defendant and although he concluded that the acquisition of a get was a religious act, he said he would marry the plaintiff. However, the weight to be given to his testimony was weakened when he admitted that the other rabbis called to testify were "far better Jewish scholar[s] than myself."
Relying upon credible expert testimony that the acquisition of a get is not a religious act, the court finds that the entry of an order compelling defendant to secure a get would have the clear secular purpose of completing a dissolution of the marriage. Its primary effect neither advances nor inhibits religion since it does not require the husband to participate in a religious ceremony or to do acts contrary to his religious beliefs. Nor would the order be an excessive entanglement with religion. In addition to testimony to that effect, the court takes judicial notice that the Legislature has seen fit to authorize clergy to perform marriages and, in doing so, permits the use of a religious ceremony. See N.J.S.A. 37:1-13. Such conduct, as sanctioned by the Legislature, has never been considered to be an excessive entanglement with religion. The get procedure is a release document devoid of religious connotation and cannot be construed as any more religious than the marriage ceremony itself. Thus, the three-prong test protecting defendant pursuant to the First Amendment is satisfied. The court concludes that it may, without infringing on his constitutional rights, order defendant to specifically perform his contract.
Order may be entered accordingly.
NOTES
[1] Acquisition of a get is unique since it may only be obtained by the husband. See 6 Encyclopedia Judaica, 132 (1971).

Execution of the Divorce. Divorce is carried into effect by the bill of divorcement being written, signed, and delivered by the husband to his wife. It is written by a scribe upon the husband's instruction to write "for him, for her and for the purpose of a divorce." The materials used in the writing must belong to the husband and the scribe formally presents them as an outright gift to the husband before writing the Get.
[2] Every Jewish marriage calls for the execution by the parties of an agreement called the "ketuba." The ketuba obligates the marital partners to comply with the laws of Moses and Israel. Certain rights and privileges as defined in those laws are granted to the wife by the husband. The consideration in the contract is the giving by the wife of her dowry and the husband obligating himself to support and care for his wife during the marriage and to comply with the laws of Moses and Israel. See Encyclopedia Judaica, supra.
[3] The Establishment Clause bars a state from placing its official support behind a religious belief, while the Free Exercise Clause bars a state from interfering with the practice of religion by its citizens. This prohibition applies to the judiciary as well as the executive and legislative branches of government. See In re Adoption of E., 59 N.J. 36, 51 (1971).
[4] Rabbis:

Rabbi Macy A. Gordon: Master's degree from Columbia University; Ph. D., Yeshiva University, in Jewish Education; ordained rabbi in 1956; on the Religious Studies faculty at Yeshiva University; chairman of the Rabbinical Council of Bergen County; vice-president of the Rabbinical Council of New Jersey; member of the executive board of commission of the Rabbinical Council of America; member of the Beth Din Commission of the Rabbinical Council of America.
Rabbi Judah Washer: Graduate of Yeshiva College; Ph. D. from University of Pittsburg; president of N.Y. Board of Rabbis; rabbi of the Jewish Center of Teaneck, N.J. since 1934.
Rabbi Menahem Meier: B.S. from the City College, New York; Semikha, Yeshiva University; Master's degree, Yeshiva University; Ph. D. from Brandeis University in Jewish Philosophy and Mysticism; past instructor at Yeshiva University High School; present founding principal of The Frisch School; chairman, Yeshiva University High School Principals Council of Greater New York; member, Rabbinical Council of America.
Rabbi Richard J. Kurtz: Yeshivah Ohelmoshe Elementary School; Yeshiva University (High School), Yeshiva College (received a teaching certificate); licensed teacher and principal of a Hebrew School; B.A. in Philosophy and Literature; postgraduate studies in comparative religion and semitic languages at Hunter College, Columbia and N.Y.U.; J.D. from Brooklyn Law School; rabbi of congregation 12 years; teacher at Yeshiva University; counsel to the Rabbinical Council of America.