223 N.J. Super. 219 (1987)
538 A.2d 438
LAWRENCE A. BURNS, PLAINTIFF,
v.
MICHELLE M. BURNS, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Camden County.
Decided December 4, 1987.
*221 James Greenberg for Plaintiff (Greenberg, Shmerelson, Weinroth & Etish, P.C.).
Saverio R. Principato for Defendant (Saverio R. Principato, P.C.).
NATAL, P.J.F.P.
This matter came before the court on a post-judgment motion by the defendant, Michelle M. Burns, for an order to compel the plaintiff to assist her in securing a Jewish bill of divorcement known as a "get."[1] The plaintiff filed a cross-motion to suppress that portion of the defendant's supporting affidavit relating to his demand for $25,000 to accede to the defendant's request pursuant to Rule 52 of the New Jersey Rules of Evidence.
*222 Background facts in this case are important, as they are not in dispute and they present the basis for the final disposition.
Both the plaintiff and the defendant had been married prior to their marriage to each other in 1969. Since they were of the Jewish religion they felt compelled to secure "gets" from their prior spouses in order to properly enter into a Jewish contract of marriage known as a "ketubbah." Under Jewish law one cannot marry in an Orthodox or Conservative ceremony without securing a "get" from a prior spouse.
At the time the plaintiff and the defendant married, plaintiff willingly proceeded with securing a "get" from his prior spouse and then married the defendant under civil and Jewish law. The marriage did not succeed and a dual judgment of divorce was granted to the parties in 1982. Since that time the plaintiff has remarried, choosing not to proceed with first securing a "get." The defendant now plans to remarry but she believes she is bound by tenet of Jewish law to obtain a "get" terminating her prior marriage before she may marry again.
Defendant's attorney contacted the plaintiff to communicate her desire to have the plaintiff secure the "get."[2] Plaintiff stated his religious beliefs are such that he no longer believed in the necessity of securing a "get." Yet, plaintiff informed defendant's attorney, if the defendant would invest $25,000 in an irrevocable trust for the benefit of their daughter, with the plaintiff and another party of his choosing as joint trustees, he would secure the "get" for the defendant.
I. All of the facts necessary for the court to make its determination were set forth in supporting affidavits. Thus, there were no genuine issues of material fact. The court is not required to take oral testimony and may decide this matter *223 without a plenary hearing. Skillman v. Skillman, 136 N.J. Super. 348, 350 (App.Div. 1975).
II. Plaintiff's request to suppress and exclude from the court's consideration that part of the defendant's supporting affidavit referring to his request for $25,000 pursuant to Rule 52 is denied. Plaintiff claims the discussion he had with defendant's attorney, wherein he demanded the sum of $25,000 to be placed in trust, was an offer to compromise the current dispute and should be barred from evidence in a court hearing.
Rule 52 provides:
OFFER TO COMPROMISE AND THE LIKE NOT EVIDENCE OF LIABILITY OR CRIMINAL WRONGDOING
(1) Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money, or any other thing, act or service to another who has sustained or claimed to have sustained loss or damage, is inadmissable to prove his liability for the loss or damage of any part of it. This rule shall not affect the admissability of evidence (a) of partial satisfaction of an asserted claim, or (b) of a debtor's payment or promise to pay all or part of his pre-existing debt as tending to prove the creation of a new duty on his part, or a revival of his pre-existing duty.
Under this Rule the courts have admitted otherwise excludable evidence, if it relates to some other issue of fact. Rynar v. Lincoln Transit Co., Inc., 129 N.J.L. 525 (E. & A. 1943); Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 200 (App.Div. 1978), cert. den. 77 N.J. 510 (1978).
Plaintiff's alleged offer to compromise is admissible to demonstrate that his refusal to secure defendant a "get" is not on the basis of his religious beliefs, but instead is an issue of monetary gain. Plaintiff initially claimed that granting the defendant a "get" was not necessary since it was contrary to his current religious beliefs. Plaintiff further asserted that his First Amendment right to practice his religion without interference from the State would be abridged if he were forced to compromise his religious beliefs.
A true religious belief is not compromised as the amount of money offered or demanded is increased. An offer to secure a "get" for $25,000 makes this a question of money not religious *224 belief. This "offer," which is not denied by the plaintiff, takes this issue outside the First Amendment. This so-called "offer" is akin to extortion.
III. This court finds Minkin v. Minkin, 180 N.J. Super. 260, 266 (1981), as the only New Jersey law controlling in this area. Judge Minuskin found that "[t]he get procedure is a release document devoid of religious connotation and cannot be construed as any more religious than the marriage ceremony itself."
The court analyzed whether there was a First Amendment entanglement. Judge Minuskin found the Establishment Clause of the First Amendment which clearly separates State and religion, is not violated when a party is ordered to secure a "get." The Court applied the standard set by the United States Supreme Court in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 772-773, 93 S.Ct. 2955, 2965-66, 37 L.Ed.2d 948 (1973). Under the three-prong test established in Nyquist, the Minkin court held that ordering a party to secure a "get," (1) reflects a clear secular legislative purpose; (2) has a primary effect that neither advances nor inhibits religion, and (3) avoids excessive entanglement with religion. 180 N.J. Super. 265-66.
The court in Minkin applied the equity powers of the court and enforced the marriage contract or "ketubbah." The "ketubbah" was held as an enforceable agreement entered into by both parties which was not unconscionable nor contrary to public policy. Id. at 262. The "ketubbah" requires both parties to conform to the provisions of the Law of Moses and of Israel. Under such law the husband is required to give his wife a "get" when the wife commits adultery. Thus, in Minkin the court ordered defendant to secure the "get" and deliver it to his wife. Id.
IV. The parties obtained a dual judgment, on the grounds of eighteen months continuous separation without a prospect of reconciliation, commonly referred to as a "no-fault" divorce. *225 The plaintiff argued that Minkin was limited to those cases where the wife was divorced on the grounds of adultery. This court rejects plaintiff's argument and thus expands the Minkin decision.
Under Rule 9 of the New Jersey Rules of Evidence, this court takes judicial notice of The Bible[3] and of the Encyclopedia Judaica.[4] The court finds both to be learned treatises containing the laws of Moses and Israel and were consulted by the court to decipher the significance of the "ketubbah." Reference is necessary to the laws of Moses and Israel because the parties have signed a written contract, their "ketubbah" (exhibit 1 in evidence), committing themselves to be bound by such law.
In studying the laws of Moses and Israel this court finds there are various circumstances which would require the husband to secure a "get" from his wife. The Minkin court found the husband compelled to grant his wife a "get" due to her acts of adultery.
In addition, a husband is compelled to secure a "get" when (1) he unjustifiably refuses conjugal rights; (2) if the husband shows unworthy conduct toward his wife such that the wife cannot be expected to live with him as his wife; (3) if the husband's unjustified refusal to maintain her when he is in the position to do so, or could be if he was willing to work and earn an income; (4) if the husband is unfaithful to his wife, or (5) if the husband habitually assaults or insults her, or is the cause of unceasing quarrels, so she has no choice but to leave the *226 household.[5]
This list is not intended to be exclusive as there are still other circumstances under which a husband is compelled to give a "get," but merely illustrative of the fact that adultery is not the exclusive ground under the laws of Moses and Israel.
The parties no longer live together. Mr. Burns has remarried. He was the plaintiff and sought the divorce. He has chosen another for his wife and married her under civil law, yet under the Jewish law the plaintiff and the defendant are still married. The plaintiff must release the defendant from the ketubbah and put an end to that relationship. The judgment of divorce provided for the parties to "be divorced from the bond of matrimony ... and each of them, be freed and discharged from the obligation thereof[.]" For the court to compel the plaintiff to submit to the jurisdiction of the Jewish ecclesiastical court, the "Bet Din," and initiate the procedure to secure a "get" is within the equity powers of this court to do what ought to be done. In doing equity, the court has power to adapt the equitable remedies to the particular circumstances of each particular case. Arabia v. Zisman, 143 N.J. Super. 168 (Ch. 1976), aff'd 157 N.J. Super. 335 (App.Div. 1978). The ultimate decision of whether a "get" is to be granted is that of the "Bet Din" and not of this court.
Therefore, this court orders the plaintiff to submit to the jurisdiction of the "Bet Din" to initiate the proceedings for a "get". In the alternative, the court will permit the plaintiff to execute the prepared document, (exhibit 2 in evidence), authorizing the preparation and presentation of the "get" to the defendant by an agent on his behalf and forego the actual appearance before the "Bet Din".
An order may be entered accordingly.
NOTES
[1] Under Hebraic law, evidence of the granting of a divorce. Black's Law Dictionary Revised 816 (4th Ed. West Publishing Co. 1968).
[2] Jewish law requires the husband to actually deliver the "get" to his wife. See 6 Encyclopedia Judaica 125 (MacMillan Co. 1971). "Divorce is carried into effect by the bill of divorcement being written, signed and delivered by the husband to the wife. It is written by a scribe upon the husband's instructions to write `for him, for her and for the purpose of a divorce'." Id. at 131.
[3] See Deuteronomy, 24:1, which states, "when a man taketh a wife and marries her, then it comes to pass if she finds no favor in his eyes because he has found some unseemly thing in her that he write her a bill of divorcement and give it in her hand and send her out of the house."
[4] 6 Encyclopedia Judaica, (MacMillan Co. 1971).
[5] Conduct of the husband as a ground for divorce. See 6 Encyclopedia Judaica 128 (MacMillan Co. 1971).