RAIZIE GOLDING, Respondent, v DAVID GOLDING, Appellant.

First Department, February 18, 1992

### APPEARANCES OF COUNSEL

*Richard J. Kurtz* of counsel *(D'Addario & Kurtz,* attorneys), for appellant.

*Elaine Rudnick Sheps* of counsel *(Valerie Porter* with her on the brief; *Rudnick & Sheps,* attorneys), for respondent.

### OPINION OF THE COURT

MILONAS, J. P.

Plaintiff instituted this action for divorce on the ground of

cruel and inhuman treatment. Defendant served an answer alleging that the complaint failed to state a cause of action and that the parties' differences had been resolved in a separation agreement produced through rabbinical arbitration. Plaintiff moved to dismiss these defenses and defendant cross-moved for summary judgment. In granting plaintiff's motion to strike defendant's affirmative defenses and denying the cross motion, the Supreme Court found that the subject agreement was void since plaintiff was coerced into signing it and that, in any event, there was no evidence that it resulted from rabbinical arbitration. Defendant has appealed.

A hearing was conducted in connection with the issues raised in the motion and cross motion. Plaintiff testified that she and defendant were married in May of 1988 and that marital problems soon manifested themselves. According to plaintiff, in June of 1989 her husband informed her that he would not accord her a Get, a Jewish divorce, unless she gave him everything that he wanted. Thereafter, her rabbi and his rabbi drew up a document that listed defendant's demands, and she signed it without understanding its contents as it was written in Hebrew. Another document was presented to her that same day reflecting more of her husband's claims. She left the encounter very upset. A week later, she attended another meeting which she believed had been convened for the purpose of arranging the Get. Instead, defendant tendered still more papers, advising her of his refusal to provide the Jewish divorce unless she signed. She did not do so, but a third meeting took place the next day at which she executed the document written in Hebrew and containing terms dictated by her husband because she was petrified of the prospect of not receiving her Get. Since a wife's ability to obtain a Get is almost completely dependent upon the acquiescence of her husband, an observant "wife is held hostage to a dead marriage", the Supreme Court observed, "unable to marry or to date. The threat of being denied a Get was particularly terrifying to plaintiff, whose sister had suffered the consequences of having been unable to obtain a Jewish divorce."

Rabbi Blum, whom the court described as being more in the nature of an intermediary than an advocate, stated that he conferred with another rabbi, Rabbi Gruss, who drew up the document, which was written in Hebrew. Rabbi Blum translated it for plaintiff, explaining that the only way for her to receive a Get was to sign the agreement desired by her husband regardless of her own feelings about it. Although

plaintiff expressed objections to some of the terms, she did sign it. Then when Rabbi Blum gave the document to Rabbi Gruss, he was handed a second one, also composed in Hebrew, which contained new terms from her husband. Once again, he advised her to sign if she wanted a Get. She signed the papers without realizing that they were different from the first set. When informed of the additions, plaintiff endeavored to withdraw her assent but capitulated after defendant threatened to withhold the Get. It was thereupon arranged that the Get would be signed in the office of Rabbi Bick. However, when the parties convened there, defendant produced yet another document which he required her to sign. Plaintiff was unwilling to do so, and an unsuccessful 4½-hour discussion ensued. Plaintiff was again told that if she did not accede to her husband's demands, there would be no Get. The parties then met in Rabbi Bick's study the following day. She finally succumbed after defendant continued to insist that without her signature no Get would be forthcoming, and she was finally rewarded with a Get.

Despite defendant's denial that he had ever told his wife that he would never allow a Get, the evidence introduced at the hearing was more than sufficient to support the Supreme Court's conclusion that "[b]y exploiting the power differential between the parties, so as to completely dominate a process which should have entailed honest negotiating, the defendant engaged in 'inequitable conduct' which 'vitiate[s] the execution of the agreement.' *Christian v. Christian,* 42 NY2d at 72. In light of the circumstances surrounding plaintiff's signing of the agreement, it can be regarded as nothing other than a document 'born of and subsisting in inequity.' " As the Court of Appeals declared in *Christian v Christian* (42 NY2d 63, 72, *supra),* "[a]greements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith". Therefore, "courts have thrown their cloak of protection about separation agreements and made it their business, when confronted, to see to it that they are arrived at fairly and equitably, in a manner so as to be free from the taint of fraud and duress, and to set aside or refuse to enforce those born of and subsisting in inequity" *(Christian v Christian, supra,* at 72; *see also Angeloff v Angeloff,* 56 NY2d 982; *Greer v Greer,* 131 AD2d 321). Applying the standard of equity, it is evident that plaintiff did not freely and voluntarily enter into the subject agreement but was compelled to do

so by her husband's invocation of his power to refuse to give her a Jewish divorce.

Defendant argues that the parties agreed to a civil and religious divorce and that a valid and binding rabbinical arbitration occurred herein which should not be disturbed as plaintiff has not demonstrated coercion or duress. However, while he urges that other than the assertions of Rabbi Blum, "who was tricked into giving a statement by Plaintiff herself, and Plaintiff's own expressed fears, about not receiving a religious divorce, no testimony was heard about coercion or duress practiced by the Defendant", there was simply no proof introduced by defendant to rebut plaintiff's contention except for defendant's uncorroborated denial that he ever declined to permit a Get; and his accusation against Rabbi Blum is purely conclusory. In *Perl v Perl* (126 AD2d 91, 94-95), this court, addressing the situation created by the husband's virtual control over the procurement of a Get, stated that:

"The unequal allocation of power between spouses to terminate a religious marriage—particularly where the partners are of the Jewish faith—has received the attention of the courts *(Avitzur v Avitzur,* 58 NY2d 108; *'Rubin' v 'Rubin',* 75 Misc 2d 776; *Chambers v Chambers,* 122 Misc 2d 671); the Legislature (Domestic Relations Law § 253), and the Executive, from which it is possible to discern an articulated public policy. In 1983 (too late to have any application to this case) the Legislature addressed this problem, imposing a statutory duty upon any marital partner seeking a divorce to a marriage solemnized by specified religious officiants to obtain, as a condition precedent for civil severance of the marital bond, a sworn statement from the moving party that he or she has taken or will take 'prior to the entry of final judgment, all steps solely within his or her power to remove any barrier to the defendant's remarriage following the annulment or divorce' (Domestic Relations Law § 253 [2] [i]). In his memorandum approving the bill, the Governor wrote:

" 'This bill was overwhelmingly adopted by the State Legislature because it deals with a tragically unfair condition that is almost universally acknowledged.

" 'The requirement of a get is used by unscrupulous spouses who avail themselves of our civil courts and simultaneously *use their denial of a get vindictively or as a form of economic coercion.*

" 'Concededly this use of our civil courts unfairly imposes

upon one spouse, usually the wife, enormous anguish.' (1983 McKinney's Session Laws of NY, at 2818, 2819; emphasis added.)"

In *Perl v Perl (supra)* the court directed a trial of the equitable issues involved in the viability of the court stipulation in question therein which was to focus upon the diminished capacity of the wife caused by the husband's stance relating to her receiving a religious divorce and the objective unfairness of the bargain. Although a hearing has already been conducted with respect to the instant matter, the holding enunciated in *Perl v Perl (supra)* is equally pertinent here. Moreover, it is instructive to note the comments of the Court of Appeals in *Avitzur v Avitzur* (58 NY2d 108, 114-115, *supra)* that: "It is clear that judicial involvement in matters touching upon religious concerns has been constitutionally limited in analogous situations, and courts should not resolve such controversies in a manner requiring consideration of religious doctrine *(Presbyterian Church v Hull Church,* 393 US 440, 449; *Serbian Orthodox Diocese v Milivojevich,* 426 US 696, 709; *Jones v Wolf,* 443 US 595, 603; see, e.g. *Reardon v Lemoyne,* [122] NH [1042] [Dec. 23, 1982]). In its most recent pronouncement on this issue, however, the Supreme Court, in holding that a State may adopt any approach to resolving religious disputes which does not entail consideration of doctrinal matters, specifically approved the use of the 'neutral principles of law' approach as consistent with constitutional limitations *(Jones v Wolf, supra,* at p 602). This approach contemplates the application of objective, well-established principles of secular law to the dispute *(id.,* at p 603), thus permitting judicial involvement to the extent that it can be accomplished in purely secular terms."

Similarly the "present case can be decided solely upon the application of neutral principles of contract law, without reference to any religious principle" *(Avitzur v Avitzur, supra,* at 115). Thus, even if the document(s) signed by plaintiff had, in fact, been the product of rabbinical arbitration, as defendant alleges, this still does not preclude the court from examining its substance and the procedure by which it was adopted so as to ascertain that there was no fraud, duress or overreaching. The judiciary must merely refrain from delving into matters concerning religious doctrine. At any rate, the Supreme Court properly found that there was no indication of rabbinical arbitration, simply that the rabbis had acted as go-betweens for the parties. Therefore, the ruling being appealed

herein should be affirmed in full. The dissent proposes that defendant be allowed to recover the Get. Yet, defendant never asks for such relief at any time, either in his pleadings, before the trial court or on appeal. Furthermore, defendant may, of course, make whatever application he deems appropriate to the Rabbinical Court.

Consequently, the order of the Supreme Court, New York County (Elliott Wilk, J.), entered on or about June 5, 1990, which granted plaintiff's motion to strike defendant's affirmative defenses and denied defendant's cross motion for summary judgment, is affirmed, without costs or disbursements.

KUPFERMAN, J. (dissenting in part). While in a case involving the Jewish religion, it may be instructive to cite *Christian v Christian* (42 NY2d 63), the principles of equity there manifest lead also to the conclusion that the parties should be returned to their original positions, and that, as a condition for striking the affirmative defenses, the plaintiff should give back the "Get".

ELLERIN and ASCH, JJ., concur with MILONAS, J. P.; KUPFERMAN, J., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered on or about June 5, 1990, is affirmed, without costs or disbursements.