**In the Matter of \* Kenneth M. SCHOLL (Husband), Petitioner,**

**v.**

**Barbara SCHOLL (Wife), Respondent.**

**No. G–1609.**

Family Court of Delaware,
New Castle County.

Submitted: April 14, 1992.
Decided: May 20, 1992.

\* The names of the parties are pseudonyms selected by this Judge.

Henry A. Heiman, Wilmington, for petitioner.

Joseph J. Longobardi, III, Wilmington, guardian ad litem for petitioner.

Gerald Z. Berkowitz, Wilmington, for respondent.

## OPINION

GALLAGHER, Judge.

The above parties have been involved in extensive legal proceedings and negotiations which finally led to a Stipulation of Settlement entered with this Court on June 28, 1990, for the settlement of ancillary matters. Four issues remain unresolved from that settlement agreement including: 1) Husband's cooperation with Wife in obtaining a *GET*, 2) Medical bills, 3) Responsibility for foreclosure costs, and 4) Counsel fees for Wife's legal costs. I am prepared to make final rulings on these remaining four issues.

### I.

In June of 1990, Husband and Wife entered into a Stipulation of Settlement which provided that all matters as to ancillary jurisdiction were dismissed subject only to the Stipulation. Paragraph 10 of the Stipulation provides; "Husband shall forthwith cooperate with Wife in allowing her to obtain a Jewish Divorce known as a *GET*." [1]

Husband did obtain a *GET* on August 8, 1990, from the Rabbinical Court of Philadelphia. However, Wife contends that this *GET* is insufficient because it was issued by a conservative rather than an orthodox Rabbinical Court. The significance of this contention is that, because Wife is of the Orthodox Jewish Faith, the issuance of a Conservative *GET* will not allow her to be considered free and able to remarry under the Orthodox Faith. This situation really hinges on three pertinent issues. 1) Whether the parties have entered into a contract enforceable by this Court, and 2) Whether a ruling requiring Husband to obtain an Orthodox *GET* would be constitutionally infirm, and 3) Assuming this Court has the authority to require Husband to obtain a *GET*, whether Husband's actions have complied with his contractual duties under the Stipulation.

### II.

Jurisdiction of the Family Court with regards to the enforcement of the Stipulation of Settlement is provided for in 13 *Del.C.* § 507(a), which states in relevant part:

"(a) The Family Court of this state should have exclusive original jurisdiction over all actions arising under this Chapter. The Court shall have exclusive jurisdiction over the construction, reformation, enforcement and recission of agreements made between future spouses, spouses and former spouses concerning the payment of support or alimony, the payment of child support, the division and distribution of marital property and marital debts and any other matters incident to a marriage, separation or divorce.

1. A *GET* is the religious bill of divorce under traditional Jewish law. It is a written document of severance, authorized by the Husband and delivered to his Wife, which states that all marital bonds between them have been severed. Under Jewish law, a Wife is not considered divorced and cannot remarry until such time as she obtains a *GET*, and a *GET* can only be obtained upon the Husband's ascertain to a Rabbinical Court that is being sought of his own free will.

The Court shall have jurisdiction to resolve any issues resulting from the construction, reformation, enforcement or recission of an agreement...."

Therefore, Family Court does have jurisdiction and the Stipulation of Settlement entered into by these parties is enforceable by this Court.

## III.

It appears that no Court in this state has been asked before to determine the constitutionality of a requirement that a party obtain an orthodox *GET*. Husband contends that both the United States Constitution and First Amendment and the Delaware Constitution of 1897 in Article I § 1 provide for freedom of religion, and that for this Court to determine that the relief sought by Wife is appropriate, it must of necessity, make a decision regarding religious teaching and must conclude that the decision of Husband in obtaining a *GET* does not meet the religious standard desired by Wife. Husband further argues that a Civil Court should not compel specific performance of a form of religious worship.

While the question of whether an Order of this Court for specific performance of the Stipulation of Settlement would constitute a violation of Husband's first amendment rights remains to be determined in Delaware, authority to permit such an order appears when applying general principles of constitutional law and the approaches taken in nearby states. It is clear that judicial involvement in matters touching upon religious concerns has been constitutionally limited in analogous situations, and Courts should not resolve such controversies in a manner requiring the consideration of religious doctrine. *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969). In a recent pronouncement on this issue, the Supreme Court, in holding that a state may adopt any approach to resolving religious disputes which does not entail consideration of doctrinal matters, specifically approved the use of a "neutral principles of law" approach as consistent with constitutional limitations. This approach contemplates the application of objective, well-established principles of secular law to the dispute, thus permitting judicial involvement to the extent that it can be accomplished in purely secular terms. *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).

The New York Court system has had numerous opportunities to decide the issue before this Court and has consistently determined that the judiciary has the authority to require a Husband to obtain a *GET*. In the case of *Avitzur v. Avitzur*, 58 N.Y.2d 108, 446 N.E.2d 136, 459 N.Y.S.2d 572, 29 ALR 4th 736, *cert. den.*, 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983), the Court held that a provision in a marriage contract entered into as part of a religious marriage ceremony, providing in part, that the parties agreed to arbitrate any post-marital religious obligations before a specified rabbinical tribunal, known as a "Beth Din [2]," was enforceable and subject to specific performance. Although recognizing the religious character of the marital contract, the court said that it did not necessarily follow that any enforcement of its obligations was foreclosed to the Courts, reasoning that a state may adopt any approach to resolving religious disputes which does not entail consideration of doctrinal matters. The Court determined that the present case could be decided solely upon the application of neutral principles of contract law, without reference to any religious principle, and consequently, that Husband's objections to enforcement of his promise to appear before the "Beth Din," based as they were upon the religious origin of the agreement, posed no constitutional barrier to the relief sought.

In *Koeppel v. Koeppel*, 138 N.Y.S.2d 366 (1954, Sup), the Court specifically enforced a provision in a preannulment agreement providing, in pertinent part, that upon the

---

**2.** A judicial body composed of a Rabbi and two or more assistants having jurisdiction in matters of Jewish law.

successful prosecution of Wife's action for the dissolution of the marriage, Husband and Wife agreed to appear before a Rabbi and execute any and all papers and documents required to effectuate a dissolution of their marriage in accordance with the ecclesiastical laws of the faith and church of the parties. The Court rejected Husband's contention that the provision was illegal and contrary to public policy in that its purpose was to procure a dissolution of the marriage, stating that not all agreements conditioned on divorce are illegal, and that not every agreement which is to become effective upon the termination of a marriage necessarily is promotive of divorce.

The Court added that a decree of specific performance would not interfere with Husband's freedom of religion under the constitution, on the basis that compliance with the agreement would not compel Husband to practice any religion, not even the Jewish faith to which he still admitted adherence, and that his appearance before a Rabbi to answer questions and give evidence was not a profession of faith. The Court concluded that specific performance would merely require Husband to do that which he voluntarily agreed to do.

A New York Court granted specific performance of a separation agreement which provided, in pertinent part, that prior to Wife vacating the premises, the parties should obtain a *GET* from a "duly constituted rabbinical Court." *Waxstein v. Waxstein*, 90 Misc.2d 784, 395 N.Y.S.2d 877 (1976), *aff'd*, 57 A.D.2d 863, 394 N.Y.S.2d 253 (2d Dept.1977). The Court rejected Husband's argument that to enforce a contractual provision requiring a spouse to obtain a *GET* would be an improper involvement of the Court in religious affairs. The Court pointed out that the validity of an agreement to obtain a *GET* had been recognized in this state, and thus the Court could grant specific performance of the provision in the separation agreement requiring the parties to obtain the *GET*, although it was precluded from enforcing the provision by means of imprisonment, or the convening of the actual rabbinical tribunal. Accordingly, the Court directed Husband to take whatever steps were necessary to secure the *GET* for Wife and it also conditioned enforcement of the other provisions in the separation agreement upon Husband's cooperation in securing the *GET*.

The State of New Jersey also recently determined that it was proper to compel Husband to secure the *GET* in accordance with the terms of the marriage contract. *Minkin v. Minkin*, 180 N.J.Super. 260, 434 A.2d 665 (1981). The Court went on to state that a contract between a husband and wife will be enforced if it is not unconscionable and if the performance to be compelled is not contrary to public policy.

Rejecting Husband's argument that the relief sought by Wife would infringe upon his First Amendment right of religious freedom, the Court relied upon expert testimony that the acquisition of a *GET* did not constitute a religious act, but was rather a severance of a contractual relationship between two parties, and that the *GET* did not affect a person's religious feelings, but was concerned only with Wife's right to remarry under Jewish law. The Court determined that the entry of an order compelling Husband to secure a *GET* would have the secular purpose of completing a dissolution of the marriage, that its primary effect neither advanced nor inhibited religion, since it did not require Husband to participate in a religious ceremony or to do acts contrary to his religious beliefs, nor would the order be an excessive entanglement with religion. The Court concluded that the *GET* procedure was a release document devoid of religious connotations, and could not be construed as any more religious than the marriage ceremony itself.

A recent Delaware Family Court opinion would suggest that Delaware is likely to take a similar approach as those in New York and New Jersey. In *Gelb v. Gelb*, Del.Fam., File No. CN87–0310, Horgan, J. (June 27, 1990), Wife filed a Rule to Show Cause against her Husband for his failure to comply with two provisions of a stipulation order between the parties which was signed by the Court. One of these provisions required Husband to "promptly apply for and utilize his best efforts to obtain a

Jewish Divorce." The Court noted that while Husband did finally contact a Rabbi, his efforts were performed rather leisurely. As such, Husband was found in civil contempt of the stipulation order and required to resolve the disputed issue within thirty days.

■ It would appear then that a ruling by this Court requiring Husband to obtain an Orthodox *GET* would not be constitutionally infirm as suggested by Husband. The ruling would not require Husband to participate in a religious ceremony or perform acts contrary to his religious belief. Such an order would not be an excessive entanglement with religion but would be proper to compel Husband to do what he already promised.

### IV.

■ Assuming this Court has the authority to require Husband to obtain a *GET*, I must determine whether Husband's actions have complied with his contractual duties under the Stipulation. Husband contends that he went beyond his obligation when he obtained a *GET* in the Rabbinical Court in Philadelphia on August 8, 1990, and furthermore, if Wife wished an Orthodox GET, then she should have made her desire to be the specific subject of the negotiations for the Stipulation of Settlement. However, regardless of whether the Stipulation requires an orthodox or conservative *GET*, the analysis made by this Court must be as to whether Husband carried out his contractual duty.

Paragraph 10 of the stipulation requires, "Husband shall forthwith cooperate with Wife in allowing her to obtain a Jewish Divorce known as a *GET*". This language specifically requires Husband to *cooperate* with Wife in allowing her to obtain a *GET*. The facts of this case strongly suggest that Husband did everything *but* cooperate with his Wife. Husband went out on his own and obtained a conservative *GET* from Philadelphia to present to his Wife. He did not ask Wife which type of *GET* she wanted, nor appeared to be concerned as to the consequences of his obtaining a conservative *GET*. Moreover, the testimony of the

two Rabbis suggest that Husband had no intention to cooperate with Wife. The presiding Rabbi at a local Wilmington Synagogue, testified that he acted as mediator for the parties' attempts at obtaining a *GET*. He made arrangements for Husband to go to a Beth Din in Philadelphia, made arrangements to prepare a Jewish Bill of Divorce, and wrote letters to various members of the Rabbinical Court.

The Rabbi further stated that Husband did not show up for the appointments with the Beth Din but that Wife did, and that later conversations between Husband and Rabbi revealed that Husband was aware of his meetings and knew he should have been present but did not choose to attend. Husband told the Rabbi that he would obtain a conservative *GET* although such a *GET* would be unacceptable for the Rabbi. At the time the *GET* was being issued, the conservative Rabbi convening the Beth Din was told that this *GET* was not acceptable. He knew in advance that issuing a *GET* would not be acceptable but went ahead and issued one anyway.

Wife put into evidence a Certificate of Release which showed that a *GET* was written for Husband. In and of itself, a Certificate of Release does not constitute a *GET*. A Certificate of Release must be issued after the issuance of the *GET*. Since the *GET* was issued subsequent to the Certificate of Release, it is not acceptable in the Orthodox religion and the Certificate of Release in effect has no significance. The Certificate of Release also notes that Wife did not accept the Conservative *GET*. In sum, the Rabbi concluded that Husband did not take the necessary steps to get Wife a *GET* and he did so knowing that the results of his actions would be ineffective. He knew the distinction between a conservative *GET* and an orthodox *GET*, yet he made no effort to accommodate Wife in her request for an orthodox *GET*. Because of obtaining a conservative *GET*, Wife is unable to remarry at her orthodox synagogue or any orthodox synagogue.

Testimony was also taken from a second Rabbi, an orthodox Rabbi responsible for

making the arrangement for the Beth Din. This Rabbi testified that Husband changed his mind several times regarding whether or not to obtain an orthodox *GET* or a conservative *GET*. The couple was married according to orthodox Jewish law and, therefore, their divorce can only be according to orthodox Jewish law. The Rabbi testified that Husband knew very clearly and very well that obtaining an orthodox *GET* would be necessary to be divorced according to orthodox Jewish law. He knew that there was no compromise. The Rabbi further stated that it was "not a big deal at all" to obtain an orthodox *GET* and that he explained to Husband the small amount of time that it would take. The Rabbi stated that Husband said to him that he would not make it easy for Wife to obtain a *GET* and that he would like to make her suffer since she made him suffer.

Husband in no way cooperated with Wife in obtaining a *GET*. In fact, Husband was totally uncooperative in his actions. This Court has no problem finding that Husband did not comply with his contractual provisions of Paragraph 10 of the Stipulation of Settlement. He is therefore directed to obtain an Orthodox *GET* within the next sixty (60) days.

### V.

■ During these lengthy proceedings, Counsel for Husband filed, in late 1990, a Motion on behalf of the petitioner for the appointment of a guardian ad litem and also a Motion pursuant to Rule 60(b) alleging that the petitioner (Husband) was incompetent and that the Stipulation should be set aside. Wife testified that when Husband indicated that he did not have the capacity to understand the Stipulation that he entered into, it was necessary for Wife to hire her own psychiatrist to rebut that allegation. Furthermore, at the same time, Husband indicated that Wife was capable of working. Wife then found it necessary to have a psychiatrist examine her in preparation for the hearing on the Rule 60(b) motion. Wife's psychological situation was so impaired by virtue of Husband's actions in failing to comply with the Court Order

as well as shocking Wife by his allegations that "she was crazy", that she needed the doctor to verify that she was not crazy. Two bills from a psychiatrist were admitted into evidence during the hearing; one for $160.00 and another for $609.58. I conclude that these services were necessary and the increased amount of them were exacerbated by Husband's allegations and failure to comply with the Court Order. Husband shall be responsible for the payment of all medical bills within the next sixty (60) days.

### VI.

■ Husband never did agree to execute the Stipulation of Settlement for payment of alimony which was eventually entered by the Court on December 10, 1991, with the Court's notation "despite his refusal to sign". The failure of Husband to sign the Stipulation or make payments pursuant to the Stipulation resulted in Husband running up substantial arrearages so that Wife was unable to pay her mortgage or have sufficient funds for the necessities of life. The failure of Wife to pay the mortgage resulted in a foreclosure action being filed by Artisans' Bank. When Wife was finally able to obtain the necessary funds to stop the foreclosure, she incurred the following expenses: a) late charges to the mortgage company, $109.16; b) attorney's fees to Cooch and Taylor for foreclosure, $600.00; c) Court costs, $24.40; and d) penalties on inability to pay taxes, $501.52; total $1,236.08. These expenses, that were incurred by Wife, were not of her own doing and were incurred solely due to Husband's failure to comply with the Court Orders and Stipulation requirements. Had Husband chosen to comply with the Stipulation, such expenses would not have been incurred. Therefore, I assess the total amount of foreclosure expenses of $1,236.08 against Husband, requiring Husband to pay the full amount to Wife within the next sixty (60) days.

### VII.

■ Husband has been extremely litigious and as a result of his conduct, has

increased Wife's counsel fees. Generally, the awarding of counsel fees is determined by looking strictly at the respective earnings of the parties, as well as their earning capacities. The Supreme Court of Delaware has held that the Trial Court may look to the conduct of the parties in determining whether to award fees, particularly if such conduct increases the cost to the other party of conducting the litigation. In *Mays v. Mays*, Del.Supr., 552 A.2d 858 (1988) (ORDER), the Supreme Court ruled that, because Wife's excessively litigious conduct had an adverse financial affect upon Husband, the trial court's award of counsel fees was proper and not an abuse of discretion.

It would appear that the inverse of such action may also entitle a party to the award of counsel fees. In this case, Husband was not complying with any Court orders. His actions led to an overabundance of Court time, cost, and aggravation to the parties involved. His conduct increased the cost to Wife of conducting and finalizing this litigation, solely on his own actions and not any actions by Wife. Counsel for Wife filed an affidavit for attorney fees in the amount of $5,022.50. I conclude that the services of Wife's counsel were required simply because of the malice of Husband, and require that the total attorney's fee of 45,022.50 be paid by Husband within the next sixty (60) days.

**IT IS SO ORDERED.**