866 P.2d 899

**In re the Marriage of Perri S. VICTOR, Petitioner–Appellant,**

v.

**Warren H. VICTOR, Respondent–Appellee.**

No. 1 CA–CV 91–0223.

Court of Appeals of Arizona, Division 1, Department C.

Oct. 7, 1993.

Review Denied Feb. 1, 1994.

Arthur N. Gorman and Charles L. Arnold, P.C. by Charles L. Arnold, Phoenix, for petitioner-appellant.

Robbins & Green, P.A. by Joe M. Romley, Phoenix, for respondent-appellee.

## OPINION

WEISBERG, Judge.

Perri S. Victor ("wife") appeals from a judgment and denial of motion for a new trial in dissolution proceedings with Warren H. Victor ("husband"). We affirm the trial court's refusal to order husband to take part in a separate religious divorce proceeding.

## FACTS AND PROCEDURAL HISTORY

In 1976, wife and husband were married in an Orthodox Jewish ceremony held in Florida. As part of their marriage, and in accordance with Jewish law, wife and husband

entered into a ketubah. A ketubah is a document recording the financial obligations that the husband undertakes toward his wife in respect of, and consequent to, their marriage—obligations that, in principle, are imposed on him by Jewish law. 10 *Encyclopedia Judaica* 926 (1972). The ketubah provides in part that the parties will comply with the "laws of Moses and Israel" and that a husband will fulfill his obligations to cherish, honor, and support his wife in accordance with those laws. In this case, the ketubah was a general, standardized document without any provisions tailored to these parties. Both parties signed the ketubah, but it was not acknowledged.

Under Jewish law, a marriage officially ends when a divorce document, called a get, is delivered to the wife. As is customary, the ketubah in this case did not refer to a get, nor did it specifically require husband's cooperation to secure a get upon the civil termination of the marriage. To obtain a get, a husband generally must initiate proceedings before a Jewish tribunal. The get must be given voluntarily after the husband is satisfied with the financial, custody, and support arrangements that have been made, and the wife must voluntarily accept it. According to Jewish law, a wife who does not receive a get is still married, notwithstanding civil dissolution; she cannot remarry and, if she does, any children of the subsequent marriage are considered illegitimate.

Husband refused wife's repeated requests for a get. As a result, wife requested that the trial court order husband to grant her a get as part of the dissolution proceedings. In the judgment and decree, the trial court stated the following:

> The Court concludes that it is without jurisdiction to order the respondent to grant an orthodox "Get." While the Court finds [husband's] actions with respect to the "Get" to be improper, it cannot intrude upon his understanding of the religious principles surrounding the granting of a "Get." Based on the testimony of the two Rabbis, respondent's refusal is not consistent with the proper exercise of his religion. This is, however, a decision which he must make and live with, and as the State

should not seek to direct his religious practice, it should not interfere in that exercise, misguided though it may be.

The only issue raised on appeal is whether the trial court in this dissolution proceeding could order husband to grant a get.

## DISCUSSION

### Jurisdiction

#### A. Equitable Powers

Wife argues that the trial court has jurisdiction to order husband to cooperate in granting her a get because it has the statutory authority and accompanying equitable power necessary to resolve all disputes related to a divorce. We begin with the proposition that "[e]very power that the superior court exercises in a dissolution proceeding must find its source in the supporting statutory framework." *Fenn v. Fenn,* 174 Ariz. 84, 87, 847 P.2d 129, 132 (App.1993) (citing *Anonymous Wife v. Anonymous Husband,* 153 Ariz. 573, 575, 739 P.2d 794, 796 (1987)). The Arizona Supreme Court has described the limits of the domestic relations court's equitable powers:

> Despite the application of equitable standards in a dissolution proceeding, it remains a statutory action, and the trial court has only such jurisdiction as is granted by statute.... A.R.S. § 25–311 vests the superior court "with original jurisdiction to hear and decide all matters pursuant to this chapter." Thus, Title 25 defines the boundaries of a dissolution court's jurisdiction and the court may not exceed its jurisdiction even when exercising its equitable powers.

*Weaver v. Weaver,* 131 Ariz. 586, 587, 643 P.2d 499, 500 (1982) (citations omitted). In *Anonymous Wife,* the supreme court held that the domestic relations court's jurisdiction extended to matters germane to statutory subject matter. 153 Ariz. at 576 n. 3, 739 P.2d at 797 n. 3 ("we see no reason to preclude the trial court from resolving the child support issue and all germane issues in the divorce proceeding, rather than in multiple proceedings").

According to Arizona statute, the trial court must enter a decree of dissolution

of marriage if it finds that "[t]o the extent it has jurisdiction to do so, the court has considered, approved and made provision for child custody, the support of any natural or adopted child common to the parties of the marriage entitled to support, the maintenance of either spouse and the disposition of the property." Ariz.Rev.Stat.Ann. ("A.R.S.") § 25–312(4) (1991). Accordingly, title 25 authorizes the trial court to assign each spouse his or her sole and separate property and to divide community or other jointly-owned property, A.R.S. § 25–318, to grant a spousal maintenance order, A.R.S. § 25–319, to decide custody matters, A.R.S. § 25–332, and to fix child support awards, A.R.S. § 25–320. We find nothing in our statutes that gives the trial court authority to order a husband to grant a religious divorce document based on equitable considerations; the religious divorce is not germane to the civil dissolution. *See Turner v. Turner,* 192 So.2d 787 (Fla. App.1966) (Florida statute that provides for only civil divorce does not authorize chancellor to require parties to secure religious divorce). Our domestic relations court has no underlying power to grant equitable relief outside of the statutory framework from which it derives its authority.

B.  Ketubah as an Antenuptial Agreement

Citing cases from other states, wife implies that the ketubah itself, which obligates the parties to live in accordance with the moral precepts of Jewish law, is a premarital contract that can be specifically enforced "as would be the case in any other type of settlement between litigants." *See, e.g., Minkin v. Minkin,* 180 N.J.Super. 260, 434 A.2d 665 (1981) ("a court of equity will enforce a contract between husband and wife if it is not unconscionable to do so and if the performance to be compelled is not contrary to public policy"); *Avitzur v. Avitzur,* 58 N.Y.2d 108, 459 N.Y.S.2d 572, 446 N.E.2d 136, (promise to submit to rabbinical court was secular and could be specifically enforced), *cert. denied,* 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983); *In re Marriage of Goldman,* 196 Ill.App.3d 785, 143 Ill.Dec. 944, 554 N.E.2d 1016 (1990) (terms of ketubah not vague and could be specifically enforced). Husband responds that the ketubah is a tra-

ditional document that should not be interpreted to require him to furnish a get, that his First Amendment protections prohibit the court from requiring a religious act, and that the ketubah is not entered into with sufficient formality to constitute an enforceable antenuptial agreement. We agree with husband that this ketubah is not an enforceable agreement.

### 1. Formality

■ The record indicates that the ketubah was signed by the parties, but not acknowledged. Arizona law at the time of the marriage required acknowledgment. A.R.S. § 25–201 (amended 1991). The Restatement, however, states the following: "Formalities which meet the requirements of the place where the parties execute the contract will usually be acceptable." Restatement (Second) of Conflict of Laws § 199(2) (1971); *see also Bryant v. Silverman,* 146 Ariz. 41, 42, 703 P.2d 1190, 1191 (1985) (adopting Restatement for analyzing conflicts questions). The ketubah was executed in Florida, which has never required that an antenuptial agreement be acknowledged to be valid. We therefore conclude that the ketubah meets any formality requirements.

### 2. Specificity

■ Provisions of an antenuptial agreement must be sufficiently specific to be enforceable. *See, e.g., Pyeatte v. Pyeatte,* 135 Ariz. 346, 661 P.2d 196 (App.1983). In *Pyeatte,* a wife claimed in a dissolution proceeding that the parties had orally agreed that she would support her husband while he was in law school and, when he finished, he would support her while she finished her master of arts degree. This court found that the agreement was not binding because it was not sufficiently definite: "Although the terms and requirements of an enforceable contract need not be stated in minute detail, it is fundamental that, in order to be binding, an agreement must be definite and certain so that the liability of the parties may be exactly fixed." *Id.* at 350, 661 P.2d at 200 (citations omitted).

In the instant case, the only specific provisions in the ketubah relate to financial obligations. Wife cites language that the parties will comply with the "laws of Moses and Israel." Such a vague provision has no specific terms describing a mutual understanding that husband would secure a Jewish divorce. *Cf. Lynch v. Uhlenhopp,* 248 Iowa 68, 78 N.W.2d 491, 496–98 (1956) (decree requiring wife to rear child in "Roman Catholic Religion" is too indefinite to support a contempt conviction). If this court were to rule on whether the ketubah, given its indefinite language, includes an unwritten mandate that a husband under these circumstances is required to grant his wife a get, we would be overstepping our authority and assuming the role of a religious court. This we decline to do. We hold that, in this case, as a matter of law, the ketubah does not constitute an enforceable antenuptial agreement.

We note that under A.R.S. section 25–202, parties may enter into written premarital agreements that are enforceable without consideration if entered into knowingly and voluntarily and if they are not unconscionable. Under A.R.S. section 25–203(A)(8), the parties to a premarital agreement may contract with respect to "any ... matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." *See Williams v. Williams,* 166 Ariz. 260, 262, 801 P.2d 495, 497 (App.1990) (parties may enter into premarital agreements if not against public policy). We are not presented with, and do not decide, whether and to what extent a premarital agreement that contains a promise to grant a get at the time of divorce is enforceable in Arizona courts. Similarly, we do not decide whether and to what extent a court could enforce such a provision in an otherwise valid separation agreement that is approved by the court as part of a dissolution. Finally, because of our resolution of this matter, we need not decide whether enforcement by a court of such a provision would violate the First Amendment. *See, e.g., School Dist. No. 26 (Bouse Elementary) of Yuma County v. Strohm,* 106 Ariz. 7, 9, 469 P.2d 826, 828 (1970) (the court does not determine constitutional issues unless the decision is necessary to determine the merits of the action).

## CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

GARBARINO, P.J., and McGREGOR, J., concur.