295 N.J. Super. 527 (1996)
685 A.2d 523
SONDRA FAYE AFLALO, PLAINTIFF,
v.
HENRY ARIK AFLALO, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part Monmouth County.
Decided February 29, 1996.
*529 Chen Kornreich for plaintiff (Kornreich & Harkov, attorneys).
Neil M. Pomper for defendant.
*530 FISHER, J.S.C.

I

INTRODUCTION
This case requires the court to visit an issue that has previously troubled our courts in matrimonial actions involving Orthodox Jews  a husband's refusal to provide a "get".[1]
Here, the parties were married on October 13, 1983 in Ramle, Israel, and have one child, Samantha. Plaintiff Sondra Faye Aflalo ("Sondra") has filed a complaint seeking a dissolution of the marriage. Defendant Henry Arik Aflalo ("Henry") has answered the complaint. The matter is on the court's active trial list and should be reached for trial in the very near future. Henry does not want a divorce and has taken action with The Union of Orthodox Rabbis of the United States and Canada in New York City (the "Beth Din"[2]) to have a hearing on his attempts at reconciliation.
The issues at hand came to critical mass when the parties engaged in a settlement conference on February 14, 1996, while awaiting trial in this court. At that time the court was advised by counsel that the matter was "98% settled" but that Henry had placed what Sondra viewed as an insurmountable obstacle to a complete resolution: he refused to provide a "get." Unlike what the court faced in Segal v. Segal, 278 N.J. Super. 218, 650 A.2d 996 (App.Div. 1994) and Burns v. Burns, 223 N.J. Super. 219, 538 A.2d 438 (Ch.Div. 1987), Henry was not using his refusal to consent to the "get" as a means of securing a more favorable resolution of the *531 issues before this court. That type of conduct the Burns court rightfully labelled "extortion". 223 N.J. Super. at 224, 538 A.2d 438. On the contrary, Henry's position (as conveyed during the settlement conference) was that regardless of what occurs in this court he will not consent to a Jewish divorce.

II

COUNSEL'S MOTION TO BE RELIEVED
Henry's position spun off an unexpected problem; it caused his attorney to move to be relieved as counsel. Arguing that since he, too, is a practicing Orthodox Jew, Pomper Certification (February 19, 1996), ¶ 4, Henry's counsel claims that he would "definitely have a religious problem representing a man who at the conclusion of a divorce proceeding refused, without reason, to give his wife a Get." Id., ¶ 7.
This motion was heard on an expedited basis. At oral argument on February 20, 1996, Henry's counsel expanded on his position and indicated, upon questioning from the court, that his religious quandary comes not from Henry's use of his consent to a Jewish divorce as leverage in negotiations (which was not occurring), but in the blanket refusal of his client to give a "get" without reason.
Henry opposed his attorney's motion. He stated under oath that he seeks a reconciliation and that Sondra had been summoned to appear before the Beth Din for this purpose. The court was also advised during oral argument that should reconciliation fail the Beth Din could recommend that Henry give Sondra a "get"; Henry stated under oath that while he desires a reconciliation he would follow the recommendations of the Beth Din and give the "get" if that was the end result of those proceedings. The court finds Henry both credible and sincere in this regard; his position clearly eliminates his counsel's stated concerns[3].

*532 III

PLAINTIFF'S ATTEMPTS IN THIS COURT TO OBTAIN A "GET"
The problem, however, festers since Sondra appears unwilling to settle this case without a "get". Accordingly, this court must now lay to rest whether any order may be entered which would impact on Sondra's securing of a Jewish divorce.
Sondra claims that this court, as part of the judgment of divorce which may eventually be entered in this matter, may and should order Henry to cooperate with the obtaining of a Jewish divorce upon pain of Henry having limited or supervised visitation of Samantha or by any other coercive means. She claims that Minkin v. Minkin, 180 N.J. Super. 260, 434 A.2d 665 (Ch.Div. 1981) authorizes this court to order Henry to consent to the Jewish divorce. That trial court decision certainly supports her view. This court, however, believes that to enter such an order violates Henry's First Amendment rights and refuses to follow the course outlined in Minkin.

A. An Overview Of First Amendment Jurisprudence

Prior to the adoption of our Nation's constitution, attempts were made in some colonies to legislate on matters of religion, including the governmental establishment of religion and the raising of taxes for the support of certain religions. Punishments were prescribed for the failure to attend religious services and for entertaining heretical opinions. See Reynolds v. United States, 98 U.S. 145, 162-163, 25 L.Ed. 244 (1878). In 1784 the Virginia legislature attempted to enact a bill "establishing provision for teachers of the Christian religion." This brought to bear the determined and eloquent opposition of Thomas Jefferson and *533 James Madison. Madison responded in his "Memorial and Remonstrance" that "religion, or the duty we owe the Creator" was not within the cognizance of civil authority. The next session of the Virginia legislature led to the defeat of the aforementioned bill and the passage of a bill drafted by Jefferson which established "religious freedom" and declared that "to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty."
Not long after the adoption of the Constitution and the Bill of Rights, Jefferson made clear the meaning and intent of the First Amendment in his famous "reply" to the Danbury Baptist Association:
Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the Government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their Legislature should "make no law respecting an establishment of religion or prohibiting the free exercise thereof," thus building a wall of separation between Church and State. Adhering to this expression of the supreme will of the Nation in behalf of the rights of conscience, I shall see, with sincere satisfaction, the progress of those sentiments which tend to restore man to all his natural rights, convinced he has no natural right in opposition to his social duties.
Since then the dimensions of this "wall of separation between Church and State" have been robustly debated and described frequently by our Nation's highest court.
The "Free Exercise Clause" of the First Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Not only does it bar a state's legislature from making a law which prohibits the free exercise of religion but it likewise inhibits a state's judiciary. In re Adoption of E., 59 N.J. 36, 51, 279 A.2d 785 (1971).
In the first instance, the Free Exercise Clause prohibits governmental regulation of religious beliefs but does not absolutely prohibit religious conduct. Braunfeld v. Brown, 366 U.S. 599, *534 603, 81 S.Ct. 1144, 1145, 6 L.Ed.2d 563 (1961); Cantwell, supra, 310 U.S. at 303-304, 60 S.Ct. at 903-904. Second, to pass constitutional muster, a law must have both a secular purpose and a secular effect. That is, a law must not have a sectarian purpose; it must not be based upon a disagreement with a religious tenet or practice and must not be aimed at impeding religion. Braunfeld, supra, 366 U.S. at 607, 81 S.Ct. at 1148; Sherbert v. Verner, 374 U.S. 398, 402-403, 83 S.Ct. 1790, 1793-1794, 10 L.Ed.2d 965 (1963).
Only when state action passes these threshold tests is there a need to balance the competing state and religious interests. The court is to engage in such balancing when the conduct or action sought to be regulated has "invariably posed some substantial threat to public safety, peace or order." Sherbert, supra, 374 U.S. at 403, 83 S.Ct. at 1793. Here, the relief Sondra seeks from this court so obviously runs afoul of the threshold tests of the Free Exercise Clause that the court need never reach the delicate balancing normally required in such cases.
The court will first endeavor to describe precisely what it is that Sondra seeks. And, while it seems beyond doubt, the court will then indicate why it cannot and certainly will not provide that relief.

B. The Jewish Divorce

"When a man takes a wife and possesses her, if she fails to please him because he finds something obnoxious about her, then he writes her a bill of divorcement, hands it to her, and sends her away from his house." Deuteronomy 24:1-4. From this biblical verse, the Jewish law and tradition that the "power of divorce rests exclusively with the husband" has its genesis. Wigoder, The Encyclopedia of Judaism (1989) 210.
The "get" is written almost entirely in Aramaic on parchment, id. at 211, and is drawn up by a "sofer" (a scribe), upon the husband's instruction to write "for him, for her, and for the purpose of a divorce," 6 The Encyclopedia Judaica (1971) 131. The materials used in the creation of the "get" must belong to the *535 husband; the "sorer" presents them as a gift to the husband before the "get" is written. Id. The spelling and the form of the document "are enumerated in minute detail in halakhic literature" and acknowledged by two witnesses. Wigoder, supra at 211. The rabbi who presides retains the "get"; he cuts it "in criss-cross fashion so that it cannot be used again," id., and to "avoid any later suspicion that it was not absolutely legal", Encyclopedia Judaica, supra at 132. The wife is given another document ("petor") which proves that she has been divorced and the "get" is filed away in its torn state. Wigoder, supra at 211.
Without such a divorce, the wife remains an "agunah" (a "tied" woman) and may not remarry in the eyes of Jewish law. Wigoder, supra at 211. If she remarries without a "get" she is considered to be an adulteress because she is still halakhically married to her first husband; any subsequent children are considered to be "mamzerim" (illegitimate) and may not marry other Jews. Himelstein, The Jewish Primer (1990) 161.

C. The Clash Of The First Amendment And Plaintiff's Desire For A Jewish Divorce
The court is not unsympathetic to Sondra's desire to have Henry's cooperation in the obtaining of a "get". She, too, is sincere in her religious beliefs. Her religion, at least in terms of divorce, does not profess gender equality. But does that mean that she can obtain the aid of this court of equity to alter this doctrine of her faith? That the question must be answered negatively seems so patently clear that the only surprising aspect of Sondra's argument is that it finds some support in the few cases on the subject.
In Minkin, the trial court requested the testimony of several distinguished rabbis. The court viewed the issue as whether a state court could order specific performance of the "ketubah". The "ketubah" is the marriage contract in which the couple is obligated to comply with the laws of Moses and Israel. Minkin, supra, 180 N.J. Super. at 262 n. 2, 434 A.2d 665. It contains the promise of the husband "to honor and support thee and provide *536 for thy needs, even as Jewish husbands are required to do by our religious law and tradition." See, e.g., Avitzur v. Avitzur, 58 N.Y.2d 108, 459 N.Y.S.2d 572, 576, 446 N.E.2d 136 (1983) (emphasis added), cert. denied 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983). The "ketubah" also contains the parties' agreement "to recognize the Beth Din ... as having authority to counsel us in the light of Jewish tradition ... and to summon either party at the request of the other...." 459 N.Y.S.2d at 576, 446 N.E.2d at 140.
In determining that it could specifically enforce the "ketubah", Minkin relied on a New York decision which stated:
Defendant has also contended that a decree of specific performance would interfere with his freedom of religion under the Constitution. Complying with his agreement would not compel the defendant to practice any religion, not even the Jewish faith to which he still admits adherence (paragraph Second of the complaint not denied in the answer). His appearance before the Rabbinate to answer questions and give evidence needed by them to make a decision is not a profession of faith. Specific performance herein would merely require the defendant to do what he voluntarily agreed to do.
[Koeppel v. Koeppel, 138 N.Y.S.2d 366, 373 (Sup.Ct. 1954).] Analyzing the case against the test used to determine whether state action violates the Establishment Clause which is set forth in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 772-773, 93 S.Ct. 2955, 2965-2966, 37 L.Ed.2d 948 (1973), the Minkin court said:
Relying upon credible expert testimony that the acquisition of a get is not a religious act, the court finds that the entry of an order compelling defendant to secure a get would have the clear secular purpose of completing a dissolution of the marriage. Its primary effect neither advances nor inhibits religion since it does not require the husband to participate in a religious ceremony or to do acts contrary to his religious beliefs. Nor would the order be an excessive entanglement with religion.
[180 N.J. Super. at 266, 434 A.2d 665.]
Also, in reliance upon the expert testimony found credible, the Minkin court concluded that an order compelling a husband to acquire a "get" is "not a religious act." Id. The court apparently relied on one of the rabbis who testified "that Jewish law cannot be equated with religious law, but instead is comprised of two *537 components  one regulating a man's relationship with God and the other regulating the relationship between man and man. The get, which has no reference to God but which does affect the relationship between two parties, falls into the latter category and is, therefore, civil and not religious in nature." 180 N.J. Super. at 265-266, 434 A.2d 665.
Minkin's approach that the "ketubah" may be specifically enforced without violating the First Amendment is in accord with the decisional law of New York, Avitzur, supra, Illinois, In re Marriage of Goldman, 196 Ill. App.3d 785, 143 Ill.Dec. 944, 554 N.E.2d 1016 (1990) and Delaware, Scholl v. Scholl, 621 A.2d 808, 810-812 (Del. Fam. Ct. 1992), and at odds with Arizona, Victor v. Victor, 177 Ariz. 231, 866 P.2d 899, 901-902 (App. 1993) and, now, this court. Minkin and its followers (including the New Jersey trial court in Burns)[4] are not persuasive for a number of reasons.
First, it examined the problem against the backdrop of the Establishment Clause and not the Free Exercise Clause. The Establishment Clause[5] prohibits government from placing its support behind a particular religious belief. The Free Exercise Clause[6], obviously implicated here, prohibits government from interfering or becoming entangled in the practice of religion by its citizens.
*538 Second, the conclusion that an order requiring the husband to provide a "get" is not a religious act nor involves the court in the religious beliefs or practices of the parties is not at all convincing. It is interesting that the court was required to choose between the conflicting testimony of the various rabbis[7] to reach this conclusion. The one way in which a court may become entangled in religious affairs, which the court in Minkin did not recognize, was in becoming an arbiter of what is "religious". As Justice Brennan observed in Serbian Eastern Orthodox Diocese v. Milivajevich, 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976):
[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.
Accordingly, civil courts may not override a decision of a religious tribunal or interpret religious law or canons. See also, Watson v. Jones, 80 U.S. (13 Wall.) 679, 728-730, 20 L.Ed. 666 (1871); Presbyterian Church v. Hull Church, 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658 (1969); Elmora Hebrew Center, Inc. v. Fishman, 125 N.J. 404, 413-414, 593 A.2d 725 (1991). Of course, religious parties and organizations are entitled to the adjudication in our civil courts of "secular legal questions." Elmora, supra, 125 N.J. at 413, 593 A.2d 725. But in doing so the civil court cannot decide any disputed questions of religious doctrine. That is exactly what the Minkin court did when it sifted among the rabbinical testimony to find the most credible version.
Third, the conclusion that its order concerned purely civil issues is equally unconvincing. In determining to specifically enforce the "ketubah", the court recognized that "[w]ithout compliance [the wife] cannot marry in accordance with her religious beliefs." 180 N.J. Super. at 263, 434 A.2d 665. As noted earlier the later *539 children of a wife who remarries without a "get" are prohibited from marrying other Jews. No matter how one semantically phrases what was done in Minkin, the order directly affected the religious beliefs of the parties. By entering the order, the court empowered the wife to remarry in accordance with her religious beliefs and also similarly empowered any children later born to her. The mere fact that the "get" does not contain the word "God", which the Minkin court found significant, is hardly reason to conclude otherwise. Nor is it sound to argue that religion involves only one's relation to the creator and not one's relation to other persons, as may be obligated by religious traditions or teachings. Minkin might as well have said that a civil court may order a Christian to comply with the Second Great Commandment[8] but not the First[9]. The concept of "religion" certainly does have reference to one's relation to the creator but it also has relation to one's obedience to the will of the creator. In one's pursuit to comply with the creator's will one is certainly engaged in religious activity. While engaging in such conduct, one may also be subjected to civil authority but that does not remove that conduct from the scope of religious activity. Minkin draws too fine a line in its rejection of the latter as an area constituting "religion" to command this court's assent to its holding.
Fourth, Minkin fails to recognize that coercing the husband to provide the "get" would not have the effect sought. The "get" must be phrased and formulated in strict compliance with tradition, according to the wording given in the Talmud. 6 Encyclopedia Judaica (1971) 131.[10] The precisely worded "get" states that *540 the husband does "willingly consent, being under no restraint, to release, to set free, and put aside thee, my wife...." Id. Accordingly, in giving his wife a "get" a husband must "act without constraint." Wigoder, supra at 210. Indeed, during the proceeding the husband is asked "whether he ordered [the "get"] of his own free will." Singer, The Jewish Encyclopedia at 647. What value then is a "get" when it is ordered by a civil court and when it places the husband at risk of being held in contempt should he follow his conscience and refuse to comply? Moreover, why should this court order such relief when that is something which the Beth Din will not do? If a "get" is something which can be coerced then it should be the Beth Din which does the coercing. In coercing the husband, the civil court is, in essence, overruling or superseding any judgment which the Beth Din can or will enter, contrary to accepted First Amendment principles. See Serbian Eastern, supra, 426 U.S. at 709, 96 S.Ct. at 2380.
Avitzur suggests a more indirect way of providing relief to the wife. A majority of the New York Court of Appeals found that the wording of the "ketubah" suggested an agreement of the marital partners to appear before the Beth Din and held that such *541 an agreement could be enforced by the civil court without running afoul of First Amendment law. The majority was careful in recognizing that it was not called upon to order the husband to provide a "get", noting that "plaintiff is not attempting to compel defendant to obtain a Get or to enforce a religious practice arising solely out of principles of religious law." 459 N.Y.S.2d at 574, 446 N.E.2d at 138. An order requiring defendant to appear before the Beth Din was found to be available because the majority viewed the role of the civil court as enforcing "nothing more than an agreement to refer the matter of a religious divorce to a nonjudicial forum." Id. The three members of the court which dissented, however, in this court's view correctly ascertained that even the limited relief which the majority of four approved required "inquiry into and resolution of questions of Jewish religious law and tradition" and thus inappropriately entangled the civil court in the wife's attempts to obtain a religious divorce. Id. at 577-578, 446 N.E.2d at 141-142.
Even if the majority opinion in Avitzur were followed by this court, the circumstances of this case do not support the relief endorsed in Avitzur. The "ketubah" only states the parties' recognition of the Beth Din as "having authority to counsel" them and "to summon either party at the request of the other...." Here, Sondra has never sought relief in the Beth Din and in fact has not appeared in response to the summons forwarded to her by the Beth Din regarding Henry's pursuit of reconciliation. Even Avitzur, it is suspected, would not enforce any attempt by Sondra to compel Henry to appear before the Beth Din when she has not honored a similar request.[11]
Minkin ultimately conjures the unsettling vision of future enforcement proceedings. Should a civil court fine a husband for every day he does not comply or imprison him for contempt for *542 following his conscience? Apparently so, according to New York law. See, e.g., Megibow v. Megibow, 161 Misc.2d 69, 612 N.Y.S.2d 758, 760 (Sup.Ct. 1994); Kaplinsky v. Kaplinsky, 198 A.D.2d 212, 603 N.Y.S.2d 574, 575 (1993). Or, as suggested by Sondra, should visitation of Samantha be limited pending Henry's cooperation? That argument finds no support anywhere. Unlike Minkin (where a judgment of divorce had already been entered), Henry seeks the intervention of the Beth Din in order to effect a reconciliation with his wife.[12] Should this court enjoin Henry  no matter how imperfect he may be pursuing it  from moving for reconciliation in that forum and order other relief which the Beth Din apparently cannot give? This court should not, and will not, compel a course of conduct in the Beth Din no matter how unfair the consequences. The spectre of Henry being imprisoned or surrendering his religious freedoms because of action by a civil court is the very image which gave rise to the First Amendment.
It may seem "unfair" that Henry may ultimately refuse to provide a "get".[13] But the unfairness comes from Sondra's own sincerely-held religious beliefs. When she entered into the "ketubah" she agreed to be obligated to the laws of Moses and Israel. Those laws apparently include the tenet that if Henry does not provide her with a "get" she must remain an "agunah". That was Sondra's choice and one which can hardly be remedied by this court. This court has no authority  were it willing  to choose for these parties which aspects of their religion may be embraced and which must be rejected. Those who founded this Nation knew too well the tyranny of religious persecution and the need for religious freedom. To engage even in a "well-intentioned" resolution of a religious dispute requires the making of a choice which accommodates one view and suppresses another. If that is permitted, it *543 readily follows that less "well-intentioned" choices may be made in the future by those who, as Justice Jackson once observed, believe "that all thought is divinely classified into two kinds  that which is their own and that which is false and dangerous." American Communications Ass'n v. Douds, 339 U.S. 382, 438, 70 S.Ct. 674, 704, 94 L.Ed. 925 (1950) (dissenting opinion).
The tenets of Sondra's religion would be debased by this court's crafting of a short-cut or loophole through the religious doctrines she adheres to;[14] and the dignity and integrity of the court and its processes would be irreparably injured by such misuse. The First Amendment was designed to protect both institutions against such unwarranted, unwanted and unlawful steps over the "wall of separation between Church and State." This court will not assist Sondra in her attempts to lower that wall. As Justice Frankfurter said, "[i]f nowhere else, in the relation between Church and State, `good fences make good neighbors.'" McCollum v. Board of Education, 333 U.S. 203, 232, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948) (dissenting opinion).

*544 IV

CONCLUSION
For these reasons, the court has denied the motion to be relieved as counsel. Further, any relief sought by either party with respect to any proceedings either currently being maintained or contemplated in the Beth Din is denied. The parties are directed to engage in a four-way conference within seven (7) days of this date and attempt to amicably resolve the issues that are actually before this court. Thereafter, they will forthwith report any results back to the court.
Henry's consent, or refusal to consent, to the providing of a "get", and Sondra's consent, or refusal to consent, to appear before the Beth Din for proceedings relating to Henry's attempts at reconciliation, are matters which are not to be bargained for or against. Accord, Segal, supra. The parties are urged, having previously resolved "98%" of the case, to resolve the remaining 2% for their own sake and, most importantly, for Samantha's sake.[15]
NOTES
[1] A "get" is a bill of divorce which the husband gives to his wife to free her to marry again. The word "get" apparently signifies the number 12, the "get" being a twelve-lined instrument. The word is a combination of "gimel" (which has a value of three) together with "tet" (which has a value of nine). See Rubin v. Rubin, 75 Misc.2d 776, 348 N.Y.S.2d 61, 65 n. 2 (Fam.Ct. 1973).
[2] The "Beth Din" is a rabbinical tribunal having authority to advise and pass upon matters of traditional Jewish law.
[3] Contentions were also made by Henry regarding his counsel's use of a retainer. Counsel argues that the attorney/client relationship is now clouded by the distrust created by these contentions. The court, however, senses that the dispute may be one which is based on a lack of communication and nothing more. In light of the fact that trial in this matter is imminent, this and the other reasons relied upon by counsel in support of his motion to be relieved are rejected and the motion denied. R. 1:11-2.
[4] Burns is equally unpersuasive, although the wife's position therein is even more sympathetic. There, the parties were divorced years earlier and the husband had remarried. However, he refused to provide his ex-wife with a "get" unless she invested $25,000 in an irrevocable trust for the benefit of their daughter. 223 N.J. Super. at 222, 538 A.2d 438. Relying upon Minkin and its broad equity powers, the court in Burns ordered the husband to "submit to the jurisdiction of the `Bet Din' to initiate the proceedings for a `get'." 223 N.J. Super. at 226, 538 A.2d 438. In the alternative, the court permitted the husband "to execute the prepared document, ... authorizing the preparation and presentation of the `get' to the defendant by an agent on his behalf and forego the actual appearance before the `Bet Din'." Id.
[5] "Congress shall make no law respecting an establishment of religion...."
[6] "Congress shall make no law ... prohibiting the free exercise thereof."
[7] One rabbi testified that the acquisition of a "get" was a religious act. 180 N.J. Super. at 266, 434 A.2d 665.
[8] "Thou shalt love thy neighbor as thyself."
[9] "Thou shalt love the Lord thy God with thy whole heart, and with thy whole soul, and with thy whole mind, and with thy whole strength."
[10] According to the Encyclopedia Judaica, the following is a translation of an Ashkenazi "get":

On the ... day of the week, the ... day of the month of ..., in the year ... from the creation of the world according to the calendar reckoning we are accustomed to count here, in the city ... (which is also known as ...), which is located on the river ... (and on the river ...), and situated near wells of water, I, ... (also known as...), the son of ... (also known as ...), who today am present in the city ... (which is also known as ...), which is located on the river ... (and on the river ...), and situated near wells of water, do willingly consent, being under no restraint, to release, to set free, and put aside thee, my wife, ... (also known as ...), daughter of ... (also known as ...), who art today in the city of ... (which is also known as ...), which is located on the river ... (and on the river ...), and situated near wells of water, who has been my wife from before. Thus do I set free, release thee, and put thee aside, in order that thou may have permission and the authority over thyself to go and marry any man thou may desire. No person may hinder thee from this day onward, and thou art permitted to every man. This shall be for thee from me a bill of dismissal, a letter of release, and a document of freedom, in accordance with the laws of Moses and Israel.
... the son of ..., witness.
... the son of ..., witness.
[Id. at 131.]
[11] During a brief hearing via telephone on February 22, 1996, Sondra's counsel indicated that Sondra had responded in writing to the summons from the Beth Din but has never provided a copy of that response to this court.
[12] Apparently, however, Henry has not paid the necessary fee and the matter now sits moribund at the Beth Din level.
[13] That Sondra has not cooperated with the summons of the Beth Din regarding Henry's attempts at reconciliation could also be viewed as "unfair".
[14] New York's legislature has provided such a short-cut. New York Domestic Relations Law § 253 requires that where a marriage has been solemnized by a clergyman, a party who commences a matrimonial action must verify that he or she has acted to remove all "barriers to remarriage." It has been held that this requirement places an obligation on a husband of the Jewish faith to provide his wife with a "get". Megibow v. Megibow, 161 Misc.2d 69, 612 N.Y.S.2d 758, 760 (Sup.Ct. 1994). In fact, that seems to have been the precise purpose of that statute. The then Governor of New York made the following statement upon passage of the statute:

This bill was overwhelmingly adopted by the State Legislature because it deals with a tragically unfair condition that is almost universally acknowledged.
The requirement of a get is used by unscrupulous spouses who avail themselves of our civil courts and simultaneously use their denial of a get vindictively or as a form of economic coercion.
Concededly this use of our civil courts unfairly imposes upon one spouse, usually the wife, enormous anguish.
[Perl v. Perl, 126 A.D.2d 91, 94-95, 512 N.Y.S.2d 372, 375 (1987).] This statute does not appear to have yet been challenged on First Amendment grounds.
[15] Sondra's request for the issuance of a bench warrant due to Henry's alleged failure to timely make support payments shall be held in abeyance pending the four-way conference.