OPINION OF THE COURT
Catherine M. Bartlett, J.
A trial in this contested matrimonial action was conducted on September 28, 2016 on the issues of (1) grounds for divorce, (2) spousal maintenance, and (3) child support. Plaintiff appeared with her attorney, Eric Ole Thorsen, Esq. Defendant appeared pro se. The parties were the only witnesses at trial. Plaintiff in addition produced documentary material (exhibits 1 through 23) which was received in evidence. Based on the credible evidence adduced at trial, the court finds as follows.
The parties are both Orthodox Jews. They married on August 7, 2002, separated in July 2007 and have lived separate and apart since that time. A prior judgment of divorce, granted to plaintiff in New York County in 2009, was vacated on defendant’s application on February 2, 2011. A separation action commenced by plaintiff in Orange County in November 2015 was thereafter discontinued, and plaintiff commenced the present action for a divorce pursuant to Domestic Relations Law § 170 (7) on March 8, 2016.
Throughout this lengthy period of matrimonial litigation, plaintiff has attempted without success to secure from defendant a “Get,” which she requires under Jewish law in order for her to remarry. Documentary evidence establishes that defendant refused to participate in proceedings in 2012 before a Rabbinical Court, asserting that plaintiff had waived her right to rabbinical arbitration by going to a secular court. The Rabbinical Court advised defendant that he had no power to decide the issue of plaintiff’s alleged waiver on his own, and was required to arbitrate that issue before the Rabbinical Court. Defendant refused to comply, whereupon the Rabbinical Court declared him to be a “Rabbinical Court evader.”
Plaintiff is 33 years of age and in good health. She is employed as a teacher’s aide. Although her 2015 tax return reflects a total income of $11,656, she acknowledges gross income of $18,000 annually. Defendant is 33 years of age, yeshiva educated, and in good health. Although he claims that *489 he is unemployed, defendant did not respond to plaintiff’s discovery demands and trial subpoena, and has thus failed to comply with his financial disclosure obligations in this proceeding. While his 2015 tax return reflects a total income of only $3,813, credit card statements and rental car records (obtained independently for trial by plaintiff) evidence undisclosed financial resources and employment on defendant’s part.
There are two children of the relationship, Y.M., aged 14 (date of birth xx/xx/2002), and S.M., aged 11 (date of birth xx/xx/2004). Y.M. is disabled and resides in an institutionalized setting at the expense of the State. S.M. has resided with plaintiff since the parties’ separation. Plaintiff has temporary physical custody of the children pursuant to an order of the Orange County Family Court. Custody and visitation issues are being litigated in Family Court.
Grounds for Divorce
Plaintiff has pleaded and proved a cause of action for divorce pursuant to Domestic Relations Law § 170 (7).
Spousal Maintenance
1. General Principles
“ ‘[T]he amount and duration of maintenance is a matter committed to the sound discretion of the trial court, and every case must be determined on its own unique facts’ (Wortman v Wortman, 11 AD3d 604, 606 [2004] . . . ).” (Signorile v Signorile, 102 AD3d 949, 950 [2d Dept 2013].) “The overriding purpose of a maintenance award is to give the spouse economic independence, and it should be awarded for a duration that would provide the recipient with enough time to become self-supporting.” (Castello v Castello, 144 AD3d 723, 726 [2d Dept 2016].)
“[A]n award of maintenance is not determined by actual earnings, but rather by earning capacity.” (Scher v Scher, 91 AD3d 842, 848 [2d Dept 2012]; Arrigo v Arrigo, 38 AD3d 807, 808 [2d Dept 2007].) “In determining a party’s maintenance or child support obligation, a court need not rely upon the party’s own account of his or her finances (see Khaimova v Mosheyev, 57 AD3d 737 [2008]; Peri v Peri, 2 AD3d 425 [2003]).” (Weitzner v Weitzner, 120 AD3d 1406, 1407 [2d Dept 2014].) “ ‘[W]here a party’s account is not believable, the court is justified in finding a true or potential income higher than that claimed’ (Scammacca v Scammacca, 15 AD3d 382, 382 [2005] . . . ).” (Castello v Castello at 725.)
*490 Thus, “ [t]he court may impute income to establish the party’s support obligation (see Domestic Relations Law §§ 240 [1-b] [b] [5] [iv]; 236 [B] [5-a] [b] [4] [a]; Wallach v Wallach, 37 AD3d 707, 708 [2007] . . . ).” (Weitzner v Weitzner, 120 AD3d at 1407.) “An imputed income amount is based, in part, upon a parent’s past earnings, actual earning capacity, and educational background.” (Morrissey v Morrissey, 259 AD2d 472, 473 [2d Dept 1999]; Matter of Zwick v Kulhan, 226 AD2d 734 [2d Dept 1996].) Among the various factors relevant to a determination of imputed income are (1) “demonstrated earning potential” (see Gorelik v Gorelik, 71 AD3d 730, 731 [2d Dept 2010]; Wallach v Wallach); (2) evidence that a “spouse’s actual income and financial resources were greater than what he or she reported on his or her tax returns” (Weitzner v Weitzner at 1407; see Wallach v Wallach); and (3) the party’s failure to provide financial disclosure (see Farag v Farag, 4 AD3d 502, 503 [2d Dept 2004]; S.A. v K.F., 22 Misc 3d 1115[A], 2009 NY Slip Op 50141[U], *18 [Sup Ct, Kings County 2009]; Janet O. v James O., 13 Misc 3d 1225[A], 2006 NY Slip Op 51985[U], *4 [Sup Ct, NY County 2006]; cf. Maybaum v Maybaum, 89 AD3d 692, 697 [2d Dept 2011]).
2. Domestic Relations Law § 236 (B) (6)
This matrimonial action, commenced on March 8, 2016, is governed by the amended Domestic Relations Law § 236 (B) (6) effective January 23, 2016.
Domestic Relations Law § 236 (B) (6) (c) establishes a formula for determining “the guideline amount of post-divorce maintenance.” Section 236 (B) (6) (e) (1) provides that the court “shall order the post-divorce maintenance guideline obligation up to the income cap . . . unless the court finds that the post-divorce maintenance guideline obligation is unjust or inappropriate” based upon consideration of one or more of 15 enumerated factors. Section 236 (B) (6) (f) (1) establishes an “advisory schedule” for determining the duration of post-divorce maintenance. Whether or not the court uses the advisory duration schedule, it must, per section 236 (B) (6) (f) (2), consider the discretionary (e) (1) factors in determining the duration of post-divorce maintenance.
Finally, Domestic Relations Law § 236 (B) (6) (o) provides: “In any decision made pursuant to this subdivision the court shall, where appropriate, consider the effect of a barrier to remarriage, as defined in subdivision six of section [253] of this *491 article, on the factors enumerated in paragraph e of this subdivision.”[1]
3. Plaintiffs Proposal for Post-Divorce Maintenance
Plaintiff represents, and defendant does not effectually deny, that defendant has repeatedly refused to provide plaintiff with a “Get.” According to plaintiff, the effect of defendant’s refusal is as follows:
“Until such time as the defendant gives plaintiff a Get, even if the plaintiff has a secular judgment of divorce, she will still be considered married to the defendant, she has no ability to remarry, nor can she have children from another relationship. If she violates this law, she is considered an adulteress, and a child born to such a ‘married’ woman from a subsequent relationship is deemed to be a ‘mamzer.’ “A ‘mamzer’ is forbidden to marry another Jew, and the ‘mamzer’ may also not marry a Gentile, as he/ she is still considered to be a Jew—a ‘mamzer’ is permitted to marry only another ‘mamzer.’ Furthermore, progeny of ‘mamzerim’ are also considered ‘mamzerim’ for four subsequent generations, and they, too, are forbidden to marry anyone other than mamzerim. This stigma is imposed on all descendants of a woman who gives birth to the child of a man while still married to her previous husband,
*492 and all her offspring are condemned to live on the sidelines of Judaism.
“Thus, traditional observant Jewish women like the plaintiff cannot and will not remarry, or even date, without first having obtained a Get from their husband. A woman who is unable to obtain a Get is loosely termed an ‘Agunah,’ which means a chained woman.”
Plaintiff therefore invokes Domestic Relations Law § 236 (B) (6) (o) and urges the court to award nontaxable spousal support until such time as defendant gives plaintiff a Get. More specifically, plaintiff proposes that income in the amount of $143,000 per annum be imputed to defendant, and that defendant be directed to pay nontaxable spousal maintenance in the amount of $2,000 per month “until such time as the Defendant removes barriers to the Plaintiff’s remarriage and gives the Plaintiff a ‘standard’ and ‘unconditional’ Jewish Divorce, or Get, which Get is deemed acceptable by the Plaintiff.”
4. Constitutional Issues
Invoking Domestic Relations Law § 236 (B) (6) (o), plaintiff asks, in essence, that this court apply financial pressure on defendant to induce him to provide the desired Jewish religious divorce. Plaintiff’s proposal raises unavoidable First Amendment concerns.[2]
The First Amendment to the United States Constitution provides inter alia that Congress “shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” The “Free Exercise Clause” of the First Amendment applies to the states through the Fourteenth Amendment’s Due Process Clause. (Cantwell v Connecticut, 310 US 296 [1940].)
In Avitzur v Avitzur (58 NY2d 108, 111 [1983], cert denied 464 US 817 [1983]), the Court of Appeals addressed “the question of the proper role of the civil courts in deciding a matter touching upon religious concerns.” In that case, the Court enforced the parties’ binding prenuptial agreement—entered *493 into as part of a Jewish wedding ceremony—to arbitrate any postmarital religious obligations before a specified rabbinical tribunal. (Id. at 111-115.) Sensitive to “the constitutional prohibition against excessive entanglement between church and State” (id. at 114), the Court reasoned that “[t]he present case can be decided solely upon the application of neutral principles of contract law,” in that (1) the parties’ agreement was akin to “an antenuptial agreement to arbitrate a dispute in accordance with the law and tradition chosen by the parties,” and (2) the relief sought by the plaintiff was “simply to compel defendant to perform a secular obligation to which he contractually bound himself.” (Id. at 114-115.) The Avitzur Court was especially careful to observe that “plaintiff is not attempting to compel defendant to obtain a Get or to enforce a religious practice arising solely out of principles of religious law. She merely seeks to enforce an agreement made by defendant to appear before and accept the decision of a designated tribunal.” (Id. at 113 [emphasis added].)
On the logic of Avitzur, the Second Department (both pre- and post-Auifczwr) has enforced separation agreements and stipulations of settlement wherein the spouses have agreed to obtain or cooperate in obtaining a religious divorce, either by imposing contempt remedies or by withholding civil economic relief. (See Fischer v Fischer, 237 AD2d 559, 560-561 [2d Dept 1997]; Kaplinsky v Kaplinsky, 198 AD2d 212, 212-213 [2d Dept 1993]; Waxstein v Waxstein, 90 Misc 2d 784 [Sup Ct, Kings County 1976], affd 57 AD2d 863 [2d Dept 1977], lv denied 42 NY2d 806 [1977].)[3] However, these cases do not address the First Amendment issues raised by a court’s compelling the provision of a Get. (See Aflalo v Aflato, 295 NJ Super 527, 532-544, 685 A2d 523, 525-532 [Ch Div 1996].) The Kaplinsky Court declined to decide whether Domestic Relations Law § 253 is unconstitutional because the issue was unpreserved for appellate review. (198 AD2d at 213.) The Fischer Court merely cited to Kaplinsky and Avitzur. (237 AD2d at 560-561.)
In this case, unlike in Avitzur and its progeny, there is no agreement or stipulation concerning the obligations of the par *494 ties with respect to a Jewish religious divorce. Hence, this case presents the issue reserved in Avitzur, i.e., the constitutionality of a court’s compelling a party to a civil divorce action to seek or obtain a religious divorce. In Becher v Becher (245 AD2d 408 [2d Dept 1997]), the Second Department avoided on the ground of mootness the question whether the Domestic Relations Law provisions directing the court to consider the effect of a barrier to remarriage in determining equitable distribution and maintenance are unconstitutional. (Id. at 408-409.)
However, the Second Department has gone so far as to hold, in effect, that consideration of a Jewish husband’s providing his wife a Get—or not—in fashioning awards of maintenance or equitable distribution is not an impermissible interference with religion in circumstances where the husband has withheld the Get solely to extract economic concessions, or where an adjustment was needed to redress adverse economic consequences resulting from the wife’s failure to obtain the Get. (See Mizrahi-Srour v Srour, 138 AD3d 801 [2d Dept 2016]; Pinto v Pinto, 260 AD2d 622 [2d Dept 1999]; Schwartz v Schwartz, 235 AD2d 468 [2d Dept 1997].)
In Schwartz v Schwartz, the Second Department wrote:
“The court’s determination that the defendant . . . forfeited the right to any distributive award by his conduct involving the granting of a Get (a Jewish religious divorce) did not constitute an impermissible interference with religion. The court made no determination regarding religious doctrine. Rather, the court found that the defendant initially withheld the delivery of the Get which he ultimately gave in Israel solely to extract economic concessions from the plaintiff.” (235 AD2d at 469 [emphasis added].)
Citing Schwartz, the Court in Pinto v Pinto held that the lower court “did not improvidently exercise its discretion in granting the plaintiff title to all of the assets listed on both of their statements of net worth if he did not deliver a religious divorce known as a Get to the plaintiff within a specified time period.” (260 AD2d at 622.) Most recently, in Mizrahi-Srour v Srour, the Second Department held:
“The plaintiff was awarded durational maintenance of $100 per week for five years, which would be increased to $200 per week if the defendant did not provide a Get (Jewish religious divorce) to the plaintiff within 60 days .... The provision increasing the durational maintenance award to *495 the plaintiff by $100 per week to adjust for the adverse economic consequences which would result to her from the defendant’s refusal to grant her a Get was proper and was not an impermissible interference with religion (see Domestic Relations Law §§ 236 [B] [6] [d]; 253 [6]; Mizrachi v Mizrachi, 82 AD3d 1178 [2011]; Pinto v Pinto, 260 AD2d 622 [1999]; Schwartz v Schwartz, 235 AD2d 468, 469 [1997]).” (138 AD3d at 802 [emphasis added].)
The Second Department’s ruling in Schwartz (and in Pinto, to the extent that it is truly founded on Schwartz) is unexceptionable. The withholding of a Get to extort financial concessions from one’s spouse constitutes simony, i.e., an exchange of supernatural things for temporal advantage. When the husband himself so unambiguously subordinates his religion to purely secular ends, he may properly be said to have forfeited the protective mantle of the First Amendment, and the court may, quite rightfully and without constitutional hindrance, impose the secular remedies authorized by the Domestic Relations Law.
Here, however, there is not the slightest evidence that the defendant has withheld a Get from plaintiff to extract concessions in matrimonial litigation or for other wrongful purposes. According to plaintiff’s own evidence, defendant has invoked religious grounds for refusing to cooperate in obtaining a Jewish religious divorce, i.e., that plaintiff by going to secular court has waived her right to rabbinical arbitration concerning the Get.
The Second Department’s ruling in Mizrahi-Srour goes beyond Schwartz. There is no intimation on the face of the Court’s opinion that the defendant husband was abusing his religiously grounded authority to withhold a Get. That his (presumably) legitimate exercise of this religious prerogative resulted in adverse economic consequences to his wife was evidently sufficient in that Court’s view to warrant the application of Domestic Relations Law remedies, in the face of a “free exercise” challenge, to adjust for said adverse economic consequences. However, the Mizrahi-Srour Court supplied no constitutional analysis in support of its conclusion that increasing maintenance on account of the husband’s failure to provide a Get “was not an impermissible interference with religion.”
The First Amendment concerns implicated by Domestic Relations Law § 236 (B) (6) (o) and Mizrahi-Srour are elaborated *496 at some length in Aflalo v Aflalo (295 NJ Super 527, 685 A2d 523 [Ch Div 1996]). In that case, the plaintiff wife urged the court to order the defendant husband “to cooperate with the obtaining of a Jewish divorce upon pain of [the husband] having limited or supervised visitation of [the parties’ daughter] or by any other coercive means.” (295 NJ Super at 532, 685 A2d at 525.) The Aflalo court observed that to pass muster under the Free Exercise Clause,
“a law must have both a secular purpose and a secular effect. That is, a law must not have a sectarian purpose; it must not be based upon a disagreement with a religious tenet or practice and must not be aimed at impeding religion. Braunfeld [v Brown], 366 U.S. at 607 . . . ; Sherbert v. Verner, 374 U.S. 398, 402-403 . . . (1963).” (295 NJ Super at 534, 685 A2d at 526.)
It was of the view that “the relief [the wife] seeks from this court so obviously runs afoul of the threshold tests of the Free Exercise Clause that the court need never reach the delicate balancing normally required in such cases.” (Id.) It wrote:
“The court is not unsympathetic to [the wife’s] desire to have [the husband’s] cooperation in the obtaining of a ‘get’. She, too, is sincere in her religious beliefs. Her religion, at least in terms of divorce, does not profess gender equality. But does that mean that she can obtain the aid of this court of equity to alter this doctrine of her faith?” (295 NJ Super at 535, 685 A2d at 527.)
After extended analysis, the court answered:
“It may seem ‘unfair’ that [the husband] may ultimately refuse to provide a ‘get’. But the unfairness comes from [the wife’s] own sincerely-held religious beliefs. When she entered into the ‘ketubah’ she agreed to be obligated to the laws of Moses and Israel. Those laws apparently include the tenet that if [the husband] does not provide her with a ‘get’ she must remain an ‘agunah’. That was [the wife’s] choice and one which can hardly be remedied by this court. This court has no authority—were it willing—to choose for these parties which aspects of their religion may be embraced and which must be rejected. Those who founded this Nation knew too well the tyranny of religious persecution and the need for religious freedom. To engage even *497 in ‘well-intentioned’ resolution of a religious dispute requires the making of a choice which accommodates one view and suppresses another. If that is permitted, it readily follows that less ‘well-intentioned’ choices may be made in the future
“The tenets of [the wife’s] religion would be debased by this court’s crafting of a short-cut or loophole through the religious doctrines she adheres to; and the dignity and integrity of the court and its processes would be irreparably injured by such misuse.” (295 NJ Super at 542-543, 685 A2d at 531.)
It is clear from the legislative history that it was precisely this purported “unfairness” of a Jewish husband’s refusal to provide a Get that drove the enactment of the Domestic Relations Law § 253 requirement of removal of barriers to remarriage:
“Although the statute is phrased in ostensibly neutral language, its avowed purpose is to curb what has been described as the withholding of Jewish religious divorces, despite the entry of civil divorce judgments, by spouses acting out of vindictiveness or applying economic coercion. See Governor’s Memorandum of Approval, McKinney’s 1983 Session Laws of New York, pp. 2818, 2819. The statute seeks to provide a remedy for the ‘tragically unfair’ situation presented where a Jewish husband refuses to sign religious documents needed for a religious divorce. (Id.)
“Though this is the purpose of the statute, the statute makes no express reference to Jewish religious divorces or Jewish religious tribunals. The absence of references to Jewish religious practices was hardly unintentional. The statute represents an obvious encroachment by the civil authorities into religious matters, particularly with respect to perceived unfairness in the religious divorce doctrines of one particular religion. In an attempt to skirt some of the difficult constitutional questions raised in the context of the relationship between church and state, the drafters of the statute wrote in neutral language and avoided any express singling out of Jewish practices. However, even approached with linguistic backhand, the contention has been raised that the entire statute is unconsti *498 tutional. The existence of constitutional questions was noted by the Governor when the original legislation was presented for signature. However, he was determined to sign the legislation because of the absence of ‘impelling precedent’ and confidence in the courts to resolve the constitutional questions. See Governor’s Memorandum of Approval, McKinney’s 1983 Session Laws of New York, pp. 2818, 2819.” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Domestic Relations Law C253:1 [2016].)
Noting the potential constitutional infirmity of Domestic Relations Law § 253 in terms directly applicable to plaintiff’s request that maintenance be so calibrated per Domestic Relations Law § 236 (B) (6) (o) as to apply financial pressure on defendant to induce him to provide a Jewish religious divorce, the Honorable Alan D. Scheinkman wrote:
“Domestic Relations Law § 253 is really designed to induce or compel Jewish spouses, especially men, to ‘voluntarily’ accede to religious divorces or else be precluded from obtaining a civil divorce decree. Viewed as such, it is questionable whether the statute can withstand constitutional challenge.
“It cannot be doubted that marriage is a personal relation and the state may fix the rights, duties, and obligations which arise out of the relationship, including the terms on which the relationship may be terminated. Maynard v Hill, 125 US 190 . . . (1888). The state may allow civil divorce, even though one spouse objects to the decree on the basis of religious conviction and even though a religious divorce cannot be or has not been obtained. See Williams v Williams, 543 P2d 1401 (Okla. Sup. Ct. 1976), appeal dismissed, cert. denied . . .426 US 901 .... Religious practices, even those relating to religious marriage practice, may be regulated, if offensive to overriding public policy. See Reynolds v United States, 8 Otto 145, 98 US 145 . . . (1878) (criminal prosecution for bigamy)[4]
“This statute does not purport to prohibit a religious practice on public policy grounds. Instead, it is intended to coerce parties to seek religious relief on pain of being deprived of civil relief. While it may *499 perhaps he permissible for secular courts to compel a party to perform a contractual obligation, though imposed in a religious writing (as allowed by the Avitzur decision), it seems doubtful that a civil statute can compel, by mandating the withholding of relief, a party to a civil action to undertake religious proceedings or submit to religious authorities and practices. The statute may be susceptible to the conclusion that it interferes with the free practice of religion and transgresses the separation of church and state.” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Domestic Relations Law C253:l [2016] [emphasis added].)
In view of the foregoing, this court holds that in the circumstances presented here, increasing the amount or the duration of defendant’s post-divorce spousal maintenance obligation pursuant to Domestic Relations Law § 236 (B) (6) (o) by reason of his refusal to give plaintiff a Jewish religious divorce or “Get” would violate the First and Fourteenth Amendments to the United States Constitution. There is no evidence that the defendant has withheld a Get to extract concessions from plaintiff in matrimonial litigation or for other wrongful purposes. The religious and social consequences of which plaintiff complains flow not from any impropriety in defendant’s withholding a “Get,” but from religious beliefs to which plaintiff no less than defendant subscribes. To apply coercive financial pressure because of the perceived unfairness of Jewish religious divorce doctrines to induce defendant to perform a religious act would plainly interfere with the free exercise of his (and her) religion and violate the First Amendment. The court accordingly declines plaintiff’s invitation to apply Domestic Relations Law § 236 (B) (6) (o) in determining defendant’s maintenance obligation.
5. Findings
Defendant is a young, well educated man in good health with an earning capacity far in excess of the very meager income reflected on his 2015 tax return. Moreover, evidence of record indicates that his earnings and financial resources exceed the amounts stated on his tax return and net worth statement, and, in addition, that defendant has willfully failed to comply with his financial disclosure obligations in this case. In view of the foregoing, the court imputes to defendant gross income in the amount of $75,000 per annum. Applying the statutory guideline for post-divorce spousal maintenance to the *500 parties’ income as determined hereinabove, spousal maintenance owing from defendant to plaintiff would be $9,696 per annum (or $808 per month, $186.46 per week) for a minimum of 2.1 years and a maximum of 4.2 years.
In accordance with the post-divorce maintenance guidelines, the court fixes defendant’s maintenance obligation at $9,696 per annum ($808 per month, $186.46 per week), taxable to plaintiff and tax-deductible by defendant, for a period of four years, and finds that this guideline obligation is neither unjust nor inappropriate in light of the factors set forth in Domestic Relations Law § 236 (B) (6) (e) (1).
Child Support
At this time, plaintiff is the custodial parent. Unless and until Family Court alters her status as the custodial parent, defendant’s child support obligation is $843.83 per month (or $194.73 per week), calculated as follows:
Plaintiff’s CSSA Adjusted Gross Income $26,319
Defendant’s CSSA Adjusted Gross Income $59,566
Combined Parental Income $85,885
Yearly Child Support (one child/17%) $14,600
Plaintiff’s share (30.64%) $4,474
Defendant’s share (69.36%) $10,126
Monthly Child Support Payment $843.83
Weekly Child Support Payment $194.73
Plaintiff’s counsel is directed to submit revised findings of fact and conclusions of law, and a revised judgment of divorce, consistent with this decision, for settlement on 10 days’ notice to defendant.

. Domestic Relations Law § 253 (3) provides that
“[n]o final judgment of annulment or divorce shall thereafter be entered unless the plaintiff shall have filed and served a sworn statement: (i) that, to the best of his or her knowledge, he or she has, prior to the entry of such final judgment, taken all steps solely within his or her power to remove all barriers to the defendant’s remarriage following the annulment or divorce; or (ii) that the defendant has waived in writing the requirements of this subdivision.”
Domestic Relations Law § 253 (6) further provides that
“[a]s used in the sworn statements prescribed by this section ‘barrier to remarriage’ includes, without limitation, any religious or conscientious restraint or inhibition, of which the party required to make the verified statement is aware, that is imposed on a party to a marriage, under the principles held by the clergyman or minister who has solemnized the marriage, by reason of the other party’s commission or withholding of any voluntary act . . . .”
As one commentator has recognized, Domestic Relations Law § 253, though framed in neutral language, is “really designed to induce or compel Jewish spouses, especially men, to ‘voluntarily’ accede to religious divorces” by providing their spouses with a “Get.” (See Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Domestic Relations Law C253:l [2016].)

. On November 29, 2016, this court gave notice to the Attorney General of the State of New York pursuant to CPLR 1012 (b) and Executive Law § 71 that the constitutionality of Domestic Relations Law § 236 (B) (6) (o), and of Domestic Relations Law § 253 (6) as incorporated therein, is at issue in this action. By letter dated December 27, 2016, the Attorney General responded that he does not intend to intervene in this action pursuant to CPLR 1012 (b).

. But cf. Margulies v Margulies, 42 AD2d 517 (1st Dept 1973), appeal dismissed 33 NY2d 894 (1973) (fines imposed for violating stipulation wherein defendant agreed to appear before rabbi for Jewish divorce sustained because defendant did not obtain stay or appeal fines, but incarceration for failure to honor stipulation was not permissible); Pal v Pal, 45 AD2d 738, 739 (2d Dept 1974) (court had no authority to enforce stipulation providing for selection of rabbis to constitute rabbinical tribunal).

. But cf. Obergefell v Hodges, 576 US —, 135 S Ct 2584 (2015).